WhitakeR, Judge,
delivered the opinion of the court:
Plaintiff alleges, that she was illegally discharged from her position with the National Labor Relations Board and she sues for the salary of which she was thereby deprived.
. The decisions of this court are uniform in holding that it will not review on the merits a removal of a Government employee where it appears that the procedural requirements prescribed by statute have been complied with, and where there is no showing that the action was taken maliciously or in bad faith. But we have also said that if it appears that an employee was discharged, not for the good of the service, but from motives of malice or for any reason other than for the good of the service, the discharge was unlawful and the employee is therefore entitled to recover the salary he would have earned had he not been illegally discharged.
We stated the reason for this in Gadsden v. United States, 111 C. Cls. 487, 489-490:
On the other hand, if the administrative officer did not act in good faith, if he in fact did not discharge the em *491 ployee for a cause that would promote the efficiency-of the service, but if, on the other hand, he was motivated alone by malice toward the employee, there would seem to be but little doubt that the employee’s rights under the Act of 1912 have been violated. That Act says, “that no person in the classified civil service of the United States shall be removed therefrom except for such cause as will promote the efficiency of said service.” If, as a matter of fact, he was removed not for a cause that promoted the efficiency of the service, but maliciously, merely because his superior did not like him, or merely because he wanted his job for some friend of his, then obviously the employee’s discharge was wrongful and illegal and, therefore, he is entitled to recover whatever loss he may have suffered thereby.
In innumerable cases it has been held that where discretion is conferred on an administrative officer to render a decision, this decision must be honestly rendered, and that if it is arbitrary or capricious, or rendered in bad faith, the courts have power to review it and set it aside. This court has this question presented to it constantly in cases arising under Government contracts, -where the contracting officer and the head of the department are given the power to render final decisions on questions of fact. Both this Court and the Supreme Court have many times held that if the decision is arbitrary or capricious or so grossly erroneous as to imply bad faith, it will be set aside. See e. g. Burchell v. Marsh, 17 How. 344, 349; Kihlberg v. United States, 97 U. S. 398; United States v. Gleason, 175 U. S. 588, 602; Ripley v. United States, 223 U. S. 695, 701.
The court will hot substitute its judgment for that of the administrative officer, but the employee nevertheless has the right to the honest judgment of the administrative officer. If that officer does not render an honest judgment but acts arbitrarily, capriciously or maliciously, then undoubtedly the rights of the employee have been violated.
The plaintiff in this case alleges that he was discharged “without cause, wrongfully, illegally and maliciously.” If he was discharged maliciously and without cause, then he has been deprived of the rights which the Act of 1912 gave him, and he is entitled to maintain this suit under section 145 of the Judicial Code (sec. 250, Title 28, U. S. C.) which gives this court power to render judgment upon a claim “founded upon * * * any law of Congress.”
*492 Our task in this case, therefore, is to determine whether or not plaintiff was discharged for the good of the service, "or arbitrarily, or capriciously, or maliciously.
Personnel disputes are hard to resolve. In undertaking to do so, we start out with the presumption that the official acted in good faith. We are always loath to find to the contrary, and it takes, and should take, well-nigh irrefragable proof to induce us to do so. In this case, however, we have reluctantly come to the conclusion that plaintiff’s superiors in discharging her were motivated, not by the good of the service, but by personal animus. In arriving at this conclusion we have not only considered the Commissioner’s reports, and the briefs and argument of counsel, but we have read the testimony in the case, and considered the exhibits.
We are particularly impressed with plaintiff’s testimony. It was straightforward, frank, without any effort to evade, and not intemperate. It “stood up” on cross-examination. On the stand she showed no passion, but was at all times courteous and ladylike, even under rigid cross-examination by Government counsel. We did not see her on the stand, but the Commissioner who did see her confirms our impression.
She was employed by the National Labor Relations Board on November 24, 1947, as a Classification Analyst on a- probational basis. Upon the expiration of six months, her employment became permanent. Her superior was:. Mrs;-Barbara Amerman, who was the only other employee of the National Labor Relations Board engaged in this work.'
When the Taft-Hartley Act [61 Stat. 136] was passed, it was- thought necessary to employ an additional analyst on a temporary basis to help classify the additional personnel to be employed to administer this Act. Mrs. Charlotte Gable was employed in March or April 1948. This woman — and this we regard of especial significance, in the light of what followed — was a personal friend of Mrs. Amerman’s, the chief of the section. This fact was made known at the time to Mrs. Amerman’s superiors, Mr. Shover and Mr, Shaw.
Mrs. Amerman and the plaintiff shared, an office on the seventh floor of the N. L. R. B. building until . Mrs, Gable *493 was brought into the Classification Section. At that time, the plaintiff’s desk was moved to the third floor where "a desk was also provided for Mrs. Gable. Within a short time, however, Mrs. Gable moved back to the seventh floor with Mrs. Amerman, leaving the plaintiff alone in the room on the third floor. From then on the work which had been previously assigned to plaintiff was gradually taken away from her and turned over to Mrs. Gable, until finally plaintiff was left with no work to do. From then on she was completely ignored by her superior, Mrs. Amerman, except for one interview now to be related.
Plaintiff was employed on November 24, 1947, by the National Labor Relations Board on a probational basis, subject to audit of her personnel file by the Civil Service Commission. After a six months’ trial period, her appointment became permanent. But in August or September 1948 it came to the attention of the Civil Service Commission that plaintiff had been separated from her former position with the Reconstruction Finance Corporation because she had abandoned her position; and, upon learning this, the Commission on September 7, 1948, notified the National Labor Relations Board that for this reason it would be necessary for plaintiff to fill out another form in which she should explain or justify the reason for her separation from the Reconstruction Finance Corporation. For some reason this request of the Civil 'Service Commission was not complied with, and on October 19 it again requested the National Labor Relations Board to have Mrs. Knotts make out this form.
When this came to the attention of Mrs. Amerman, she ■called plaintiff to her office and accused her of lying when she had made out her original form, since she had not disclosed that she had abandoned her former position at the Reconstruction Finance Corporation. Plaintiff told her that she did not know her separation was so regarded, that for a long period of time she had been sick following the' birth of her last'child, and that when she finally returned to her job with the Reconstruction Finance Corporation she was told that it had been filled; but she stated that she did hot understand that' hér separation had been classified as aii abandonment of position.
*494 The record indicates that this was the last contact between Mrs. Amerman and plaintiff. Very shortly thereafter, however, Mrs. Amerman wrote to Mr. Shover, the Personnel Director, a memorandum recommending that Mrs. Knotts be relieved of her position and, by inference, that Mrs. Gable be retained. Her memorandum is set out in a footnote below.[1]
The assigned reasons for her recommendation were that on one occasion Mrs. Knotts had misstated the facts, that she had failed to obtain and report accurate and adequate facts, that she had been guilty of professional indiscretion and had made technical and clerical errors, and that she had been lacking in cooperation and in the observance of proper channels.
This recommendation was acted upon promptly by Mr. Shover. Indeed, it is apparent that Mrs. Amerman’s recommendation was made after consultation with Mr. Shover and with Mr. Shover’s superior, Mr. Shaw, the head of the Administrative Division. Mr. Shaw testified that he directed Mrs. Amerman to prepare the memorandum. On the next day, November 3, 1948, after receipt of Mrs. Amer-man’s memorandum, Mr. Shover wrote the Civil Service Commission a letter suggesting that it set aside plaintiff’s permanent appointment, and that it give her a temporary appointment for 12 months from the date of her original appointment, which would have expired November 23, 1948. Shover also wrote that it was the intention of the Board to abolish the position of classification analyst CAF-7, which was the position held by plaintiff, on December 1. Mrs. Amerman’s friend, Mrs. Gable, who had been brought in as a classification analyst on a temporary basis, held grade CAF-9.
*495 ' The Civil' Service Commission later refused this request, but eventually plaintiff was discharged and Mrs. Gable-was retained.
In the meantime, Mr. Shover embarked on a campaign to force plaintiff to resign. He permitted Mrs. Amerman, who was his subordinate, to take all work away from plain- • tiff and to leave plaintiff by herself on the- third floor with no work to do. He forbade other employees from having lunch with plaintiff and from associating with her in any way.
On a certain occasion Shover was having a picnic at his home for some of the employees. Plaintiff, who lived in the same neighborhood as Shover, told him she would take two or three of them, whom she named, in her car, although, she herself could not go to the picnic because she had to care for her children and her husband. On the day of the picnic, just before closing time, Shover called plaintiff and told her that he wanted her to take two or three negro couples instead of the people she had named. Plaintiff refused, and took no one. ■
One day, after most of the employees had left the building,' and while plaintiff was alone on the third floor, a negro man by the name of Carl Snipes came into plaintiff’s office to ' inquire about his classification, stating that he understood that plaintiff was working on it. Plaintiff' says that she felt uneasy, being alone on the third floor with this man, after everybody had gone, and she called Mr. Shaw’s office, who, she understood, frequently worked late in the afternoon. On finding Mr. Shaw in, she sent Snipes up to see him. Shaw reported this incident to Shover and Mrs. Amerman. The following day Mrs. Gable came down to the third floor to see plaintiff, much incensed at what she termed plaintiff’s interference in a matter that she was handling, and she asked plaintiff what she was trying to do; “are you trying to beat Mrs. —’s time with Carl Snipes ?”
Mrs. Gable was plaintiff’s immediate superior when Mrs. Amerman was away, and it was she whom Mrs. Amerman and Mr. Shover intended to retain on a permanent basis when they got rid of plaintiff.
*496 This course of conduct on the part of Mrs. Amerman arid Mr. Shover quite naturally caused plaintiff a great deal' of uneasiness, and she went to see Mr. Shaw, who was the. head of the Division of Administration, and Mr.- Shover’s and Mrs. Amerman’s superior, to get him to intercede in her behalf.
Both Mr. Shover; and Mrs. Amerman had- already discussed plaintiff’s case-with Mr. Shaw; hence, Mr. Shaw met plaintiff’s request for intercession with an argument to convince her that she should consent to the change in her status from permanent to temporary, with the promise that they would give her an additional 30 days after November 23, 1943, in which to find a job in some other agency. He told plaintiff that if she did not consent to this that she would receive an “unsatisfactory” rating, which would prejudice her in getting a job elsewhere. His conversation with plaintiff was on November 10.
On the, following day he wrote her a long memorandum confirming his conversation with-her.
Six days later, on November 17, Mr. Shaw wrote her another memorandum stating that Mr. Denham, the General Counsel, meant to interview her, but had not been able to do :so on account of her illness. (She had been much upset by her interview with Mr. Shaw, and had gone home sick.) He further told her that she would be relieved of her duties as a classification analyst, and concluded his memorandum with this paragraph: •
Let me also confirm in writing your verbal agreement of November 12 to.discuss your views of the work and personnel of the Personnel Branch only with Mr. Den-ham, Mr. Smith, or myself until such time as your case has been disposed of. It is understood, of course, that it may become necessary for you to consult certain other persons in-order to obtain facts respecting your case. You also agreed that it would be undesirable and improper to have any outside pressure brought to bear upon me or Mr. Denham while your case is under consideration.
(Senator Hoey, of North. Carolina, from which State plaintiff comes, had vigorously interceded in plaintiff’s behalf. That is the explanation for the last sentence.)
*497 On November 18, Mr. Denham, the General Counsel and in overall charge of personnel matters, had an interview with plaintiff. He stated the substance of this interview in a long .memorandum to Mr. Shaw. In it he said he.told her she ought to find a job elsewhere, and that if she persisted in staying on she would wind up with ah “unsatisfactory” efficiency rating, which he said he wished to avoid. His memorandum, which is set out in full in- the findings, shows that he was thoroughly cooperating with Mrs. Amerman, Mr. Shover, and Mr. Shaw.
Within a few days plaintiff had a nervous breakdown and was treated in a local hospital for two or three weeks.
■ Later, plaintiff telephoned Mr. Shaw that she was ready to come back to work, but Shaw made the astonishing, but revealing, reply that he could not permit her to do so until he had had a talk with her physician. She presented a certificate from her doctor that she was able to resume her work,, but still Shaw told her he would not permit her return until he had had a personal talk with her physician.
She came back anyway, and Shaw put her to work reading the Taft-Hartley Act. Later, she was given some sort of clerical work to do in the Industrial Analysis Branch of -the National Labor Eelations Board. Later she was transferred to another section.
On April 28, 1949, the Civil Service ■ Commission turned down the request made by Mr. Shover’s letter to put Mrs. Knotts on a temporary status, and confirmed her rating as a classification analyst CAF-7.
So, balked in -their design, to induce or. to force her to resign, there was now nothing left to do but to prefer charges against her, and, thus, to dismiss her.
Preparatory thereto both Mr. Shover and Mr. Shaw instructed the chief of the section where Mrs. Knotts had been working, since her dismissal from the classification section, to report to them any derogatory matter which might come to his attention concerning plaintiff. Parenthetically, no such report was made, but, instead, the chief of this section stated that her work was satisfactory.
*498 • Finally, Mr. Denham instructed Mrs. Amerman and Mr. .Shover, in conjunction with Mr. Shaw, to prepare the charges. The charges were:
■ 1. You have fomented, or participated in, • discussions and dealings which tend to create or aggravate factions and ■ critical attitudes in one or more persons towards others in the agency.
2. You have made inaccurate or misleading statements.
3. Your comments and activities interfere with, or give the wrong impression concerning the work and character of officials and employees of this Agency.
Examples to illustrate these reasons are shown below.
* Jfc * * *
This was followed by a long list of things, most of which seem trivial, and frequently without any substance at all. At any rate,-they are at variance with the rating plaintiff received for her services during the period in question.
The matter of this rating is pertinent. Plaintiff’s services were rated by her superiors as “unsatisfactory.” As originally made, it covered the period of April 1,1948, to March 31, 1949, but later, for some reason, the date of March 31, 1949, was lined through and the date November 15, 1948, was substituted, although Mrs. Amerman signed the rating on May 31, 1949, and Mr. Shover, on June 10, 1949.
Plaintiff appealed from this rating. An appeal panel of two men was appointed by Mr. Shaw. One member of the panel rated plaintiff “good,” and the other one “fair.”
The charges mentioned above are also inconsistent, at least in part, with the letter “To whom it may concern,” written by Mr. Shaw on June J, 1950. This letter reads:
It is our understanding that Mrs. Elizabeth P. Knotts is applying for Federal employment in some of the following fields, namely, Office Services, Information, Administrative Assistant, Receptionist, processing correspondence, or handling Mails and Files.
Mrs. Knotts was formerly employed by this Agency from November 24,1947, to July 20,1949. She came into employment here as a classification analyst CAF-7. Our records indicate that her efficiency rating for the first 6 months of her employment was “Good”.
In the capacity as a junior classification analyst, Mrs. Knotts surveyed a number of positions, assembling data *499 needed by the Classification Officer to determine tbie complexity and difficulty of each job. After a period of somewhat less than a year, we found that this arrangement had certain disadvantages, and that, the needs of the Agency would be better served by engaging a more experienced assistant to work with our Classification Officer. It also became apparent that the circumstances did not justify retaining also a junior analyst. Arrangements were made at that time to give Mrs. Knotts an opportunity to find employment elsewhere.
While Mrs. Knotts was seeking another position, she was temporarily assigned to clerical work in the Division of Administration. This work she carried on in an adequate manner. It is our opinion that Mrs. Knotts is qualified for, and could perform satisfactorily in, a junior level position in any of the fields of work enumerated in paragraph one.
In the meantime the delegation of authority as to personnel matters which had been given by the Board to Denham had been withdrawn.
Denham forwarded the rating to the Board with a vigorous and lengthy letter of protest. On October 26, 1950, after her dismissal, plaintiff received a letter from the chairman of the Board notifying her that she had been rated “fair.”
To return to the charges — Mr. Denham preferred them on July 6, 1949; plaintiff was given until July 13 within which to make reply. Mr. Denham notified her that unless her reply induced him to change his mind, that she would be discharged on July 20, 1949. Plaintiff replied requesting a hearing, but Mr. Denham refused the hearing, saying that he knew all about the case anyway; and plaintiff was accordingly discharged-on July 20,1949.
All this leads us to the conclusion that the reason for plaintiff’s discharge was not the unsatisfactory character of her services, but was because Mrs. Amerman wanted to get rid of her in order that her friend, Mrs. Gable, might take her job, and that she initiated a conspiracy between Mr. Shover, Mr. Shaw, Mr. Denham, and herself to bring about this result. The record convinces us that Denham was a part of this conspiracy, and that when he preferred these vague charges, and found plaintiff guilty of them and dismissed her, he was motivated not by what he thought was *500 tbe good of the service, but by the aims of the conspiracy, which was to get rid of plaintiff so Mrs. Gable could have her job.
Mrs. Amerman had originally rated plaintiff “good,” but when Mrs. Gable came, she rated plaintiff’s services “unsatisfactory,” but this' was reversed on appeal. Nothing had happened since the initial “good” rating to justify Mrs. Amerman in giving plaintiff the “unsatisfactory” rating. We are convinced she did so in order that her friend Mrs. Gable might have her job. In this she was.aided and abetted by Mr. Shover, Mr. Shaw, and Mr. Denham.
If we are correct in this, then the Act of August 24, 1912 (37 Stat. 539, 555; U. S. C. Title 5, sec. 652), has been violated, which provides that no person in the classified Civil Service shall be discharged “except for such cause as will promote the'efficiency of such service * *
This being true, plaintiff is entitled to recover. She asks for her salary from the date of her discharge on July 20, 1949, to April 17,1-951. She may recover for the period from July 21,1949 to April 17, 1951. The amount thereof, less earnings from other employment, is $6,969.01. Judgment for this amount will be entered.
• LaRamohe, Judge; Madden, Judge; Littleton, Judge; and Jones, Chief Judge, concur.
BINDINGS OF FACT
The court, having considered the evidence,' the reports of Commissioner William E. Day, and the briefs and argument of counsel, makes findings of fact as follows:
■ 1. On November 24, 1947, the plaintiff was appointed by reinstatement to the position of Classification Analyst in the Personnel Branch, Division of Administration, in the National Labor Relations Board. This position was in the Classified Civil Service, grade CAF-7, at a salary of $4,149.60 per annum.
2. The plaintiff seeks by this action to recover salary from July 20, 1949, the date of her dismissal, to April 17, 1951. It is her claim that her dismissal was motivated by a desire *501 on the part of her superiors to replace her with another person.
3. The Notification of Personnel Action by which she was reinstated; as shown in finding 1, states under “Remarks” that the appointment was to be subject to a trial period of six months, that she had not been removed for cause from her last position in the Federal service, and further that it was subject to approval by the Commission, a check of records, and such investigation as might be necessary.
Upon the expiration of the six months’ trial period, the appointment ripened into a permanent appointment.
4. The plaintiff entered on duty on November 24, 1947.. ..
5. The plaintiff was assigned to work under the direction of Mrs. Barbara Amerman, the Classification Officer, in the Classification Section of the Personnel Branch, which was a part of the Division of Administration. At all times material herein prior to the plaintiff’s dismissal, the Division of Administration functioned as a part of and. subordinate to the Office of the General Counsel under a delegation of authority from the National Labor Relations Board. During all times herein material, Robert N. Denham was General Counsel, Carroll K. Shaw was Director of the Division of Administration, and John C. Shover was Director of Personnel.
6. The plaintiff and Mrs. Amérman were, Until the spring of 1948, the only persons in the Classification Section, With the exception of a stenographer, who were engaged in personnel classification work. ■ The agency was then expanding under the requirements of the Taft-Hartley Act from a force of approximately- 760 to approximately 1,200 employees. This required an expansion of the classification work and resulted in the employment on a temporary basis, as an additional Classification Analyst at a higher salary than the plaintiff, of a person who was a long-time personal friend of Mrs. Amerman. This person was Mrs. Charlotte Gable who was employed .by the National Labor Relations Board in the spring-of 1948 as a'temporary appointee, with the full knowledge on the part of the Director of Personnel and the Director of the Division of Administration that she was a personal friend of Mrs. Amerman. After the plaintiff’s *502 dismissal, Mrs. Gable’s employment status was changed from temporary to permanent.
7. On May 11,1948, for the period ending March 31,1948, Mrs. Amerman, as plaintiff’s rating official, made a report of efficiency rating as to the plaintiff with a rating of “Good,” in which all of the elements which were considered as applicable to plaintiff’s position were marked at least “Adequate,” those relating to cooperativeness and industry were marked “Outstanding,” and none was marked lower than “Adequate.” To this efficiency rating, which was approved by the Director of Personnel the following day, the' following notation is appended:
Circumstances have not allowed sufficient time during this rating period to direct the work of Elizabeth Knotts. The rating has been discussed with her and she has indicated that she understands the basis for it. Further, she has been informed that steps are being taken to place her in a current revised position (CAF-233-7), Position Classifier and that during the next rating period she will be rated more completely on the technical aspects of her work. I have suggested to her ways in which she should conduct herself in order to show improvement in work performance during the next rating period.
8. By the latter part of October some friction had developed in the Classification Section which caused Mrs. Amer-man on November 2, 1948, to prepare a detailed report consisting of six pages based primarily upon the lack of efficiency of the plaintiff. This report was transmitted to Mr. Shover, the Director of Personnel, by Mrs. Amerman, with the following memorandum:
Attached is a report concerning Elizabeth P. Knotts, Position Classifier, Grade CAF-7. In view of this report, I believe that Mrs. Knotts has not proved suitable as a Position Classifier, and to continue her services would not be to the best interests of the office. Consequently, I recommend that she be relieved of her-assignment in the Classification Section immediately.
It is hoped that the use of one well qualified Position Classifier in addition to Mrs. Amerman will be sufficient for our needs for the time being, and, therefore, the CAF-7 position will not be filled.
*503 The recommendation was based upon the following stated! grounds: misstatement of facts; failure to obtain and report accurate and adequate facts; professional indiscretion; technical and clerical errors; and lack of cooperation and observance of proper channels. The report was prepared after consultations between Mrs. Amerman, Mr. Shover, and Mr. Shaw, at Mr. Shaw’s suggestion.
9. On September 7,1948, the Civil Service Commission, by a form letter to the N. L. R. B., advised that office that the records of the Commission showed that the plaintiff had left her previous position with the Reconstruction Finance Corporation by abandonment of such position, which was considered a separation for cause. The form letter is quoted in part as follows:
Standard Form 57, fully executed by the appointee, must be forwarded to the office indicated and should be accompanied by any additional information surrounding the reason for separation contained in his personnel folder. * * *
On October 19, 1948, the Civil Service Commission again advised the N. L. R. B., by form letter, that a Form 57 was necessary.
10. At about the time the above-described letter was received by the N. L. R. B., Mrs. Amerman, in discussing it with the plaintiff, told her that she, the plaintiff, had come into the agency under false pretenses, and upon being asked to explain what she meant, Mrs. Amerman said that the plaintiff had not told the truth in filling out her Form 57 concerning the reasons for leaving her position at the R. F. C.
Plaintiff told Mrs. Amerman that she had been ill for a lengthy period following the birth of her child, and that when she finally returned to her job with the R. F. C. she was told that it had been filled. Plaintiff stated, however, she did not understand that she had been formally discharged by the R. F. C.
11. On November 3,1948, Mr. John C. Shover, the Director of Personnel, addressed the following letter to the Civil Service Commission:
*504 This is' in reference to- the notice by- your Commission that this Agency was in error in processing the reinstate.ment of Mrs. Elizabeth P. Knotts on November 24,1947 as a reinstatement under Section 7.104(a) of the Civil Service' regulations. Your notice informs us that if Mrs. Knotts is to be reinstated, she must be reinstated under Section 7.103 of the regulations. Conversation with representatives of the Commission indicate that the reason for this requirement on the part of the Commission is that Mrs. Knotts was separated from her prior position at RFC by reason of abandonment of position which falls under Section 7.103 (3).
Since the above action as a reinstatement has not been approved by the Commission, and since developments in our classification program have led to the decision to abolish the position of Classification Analyst CAF-7 on December 1, this Agency desires to revise the action in line with current conditions. In order to. cover the appointment ■ of Mrs. Knotts since November 24, 1947, this Agency requests retroactive approval for her appointment on a temporary basis, not to exceed one year.
12. The letter quoted in the foregoing finding was written after conferences among Mr. Shover, Mr. Shaw and Mr. 'Denham, the General Counsel. Mr. Shover took this action so that he might dismiss the plaintiff as a temporary employee if the Civil .Service Commission should grant retroactive approval of her appointment on a temporary basis not to exceed one year. In this connection it should be noted that the one-year period would have expired on November 23,1948.
The Executive Director and Chief Examiner of the Civil Service Commission on April 28, 1949, sent the following letter to. the N. L. R. B., addressed to Mr. Shover, Director of Personnel:
Reference is made to the case of Mrs. Elizabeth P. Knotts (date of birth November 7,1916) whose reinstatement as classification analyst, CAF-7, $4149.60 per an-num, you erroneously effected on November 24, 1947, under section 7.104 of the Civil Service Regulations subject to post audit by this Commission. You were advised on September 7,1948 that Mrs. Knott’s case would be processed under section 7.103 of the Regulations.
Action has now been completed in Mrs. Knott’s case and this letter is authority for her reinstatement under section 7.103 of the Regulations as classification analyst, *505 CAF-7, $4149.60 per annum, in the National Labor Relations Board, effective November 24, 1947. Your request of November 3, 1948 for retroactive approval for her appointment on a temporary basis not to exceed one year has been disapproved. Standard Form 50 dated November 22, 1948 showing the temporary appointment of Mrs. Knotts, effective November 24, 1947, should be canceled.
13. In the meantime the plaintiff became upset because she feared that she might be forced out of her position, and she discussed her problem with various officials of the. N. L. R. B. in the hope of obtaining assistance. She also-had discussions with Mr. Shaw. That official, on November 11, 1948, wrote the following memorandum to the plaintiff' of a discussion had with her on the previous day:
To avoid any possible misunderstanding, let me confirm in writing the principal points of our discussion of your present situation yesterday morning.
A. I told you that our discussion might follow one of two lines: (1) If you had confidence in my sense of justice and my integrity, we could turn at once to the conclusions I had reached, and steps I proposed to take; (2) If you did not have full confidence in me, which would be quite understandable under the circumstances, I would be glad to review in detail the facts as they had been presented to me. You indicated your confidence in me was such that the first course was acceptable; and I must say, I sincerely appreciate such confidence and hope never to abuse it.
B. I then summarized my views of the situation as it appeared to me, as follows: (1) Your superior, Mrs. Amerman, had made clear that she lacked confidence in your ability as a classification analyst, including your discretion respecting necessarily confidential personnel matters when talking to employees and others, your accuracy in reporting facts, your evaluation of allocating factors when recommending the appropriate grade. (2) You had, yourself, said that it had become impossible to continue working with Mrs. Amerman, and had asked me if there were another post elsewhere in the Board where you could be placed. (3) It seemed clear to me that, regardless of whether your superior’s unfavorable view of your work was amply justified or not, you could no longer work either with her, nor she with you, with any hope of either doing the best work of which she may be capable.
*506 C. Under such circumstances, two courses were possible to get you to a spot where the working situation, would be congenial: (1) Transfer you to a position elsewhere in Ñ. L. R. B.; or (2) Help you to find congenial work elsewhere. A study of all positions in the Washington office, failed to reveal any regular position to which you could be assigned; and you had previously indicated you must remain in Washington.
D. To accomplish the second course, it would be desirable to keep out of your record such unfavorable information as the views of your present supervisor. One way to do this was offered by the unusual circumstances under which you entered the employ of N. L. R. B. a year ago. .
Last September, the Civil Service Commission had notified the N. L. R. B. that, because your appointment to R. F. C. had been terminated by “Abandonment of .Position,” your subsequent appointment to the N. L. R. B. should have had prior approval of the Commission. Since the N. L. R. B. had failed to secure this prior approval, it was now necessary for you to submit a Form 57 so the Commission could decide whether a retroactive approval could be given after a review of the circumstances under which you left R. F. C. Until such approval is obtained, your appointment at N. L. R. B. is an incomplete action. This opened up a way of -closing your employment with N. L. R. B. without facing .the prospect of a later unsatisfactory efficiency rating from your supervisor, which would certainly be a handicap to you when seeking appointment elsewhere. It is proposed, therefore, that in asking the Commission for retroactive approval of your appointment to the N. L. R. B., we also change the term of the appointment from “indefinite” to “temporary,” in other words, for •one year. Your appointment would then expire on November 28, but we would, before then, request the Commission to further extend the appointment so that you -can have at least 30 days, plus any accumulated annual leave, in which to locate a new position.
E. In our subsequent discussion you stated your belief: (1) Your services as classification analyst were .satisfactory, as evidenced by the fact that (a) the Civil Service Commission had accepted and approved all job .allocations recommended by you; and (b) operating ■officials were satisfied with your work; (2) Mrs. Amer-man was doing everything in her power to get you out :.so that Mrs. Gable’s employment with N. L. R. B. would ’.be continued in the face of the expected decline in clas *507 sification work; (3) Mrs. Amerman’s competence as a classification analyst is questionable because of (a) the general cuts made by the Commission in allocations proposed by her for our Fiscal Section, (b) lack of confidence in her has been expressed by many operating people, (c) other classification analysts do not have a high regard for her work. (4) Mrs. Amerman had not told you that your services were unsatisfactory, and had failed to carry through with her promise, given last May when assigning your efficiency rating, to give you closer supervision and guidance so that the quality of your work might be improved and a higher efficiency rating earned in the future. (5) Mrs. Amerman has reviewed job descriptions with you on only one or possibly two occasions in recent months to advise you on technical questions.
F. I told you that on the question of your performance as classification analyst, I would be glad to bring in an outside analyst of known competency to assist me in anyway possible to determine whether Mrs. Amer-man’s opinion of the low quality of your work was justified. You did not accept this proposal.
G. I further assured you that, if the proposed course of action outlined in C above was not acceptable to you, I would not undertake another course of action until you had an opportunity to present fully any facts on your side of the controversy. But I also reminded you that, however the facts might lie, it was clear that you could under no circumstances continue in your present assignment, and that, if open controversy developed, or charges were made, everyone concerned would be subject to unfavorable views and comments. I pointed out that in such an event your record at R. F. C. would not help your case here.
14. On November 17, 1948, Mr. Shaw wrote the following memorandum to the plaintiff:
Yesterday, Mr. Denham indicated that he intended to discuss your case with you personally, however your absence on sick leave caused a postponement. I understand that he is not expected to be in his office today.
Until Mr. Denham has an opportunity to consider your case fully, it seems advisable to relieve you immediately from further duties in the Classification Section. Until further notice, you will please report to my office. In view of your own absence from the office today, I am asking Mrs. Amerman to pick up your current working *508 materials so that your classification, assignments can be completed by others without unnecessary delay.
Let me also confirm in writing your verbal agreement of November 12 to discuss your views of the work and Eersonnel of the Personnel Branch only with Mr. •enham, Mr. Smith, or myself until such time as your case has been disposed of. It is understood, of course, that.it may become necessary for you to consult certain other persons in order to obtain facts respecting your case. You also agreed that it would be undesirable and improper to have any outside pressure brought to bear upon me or Mr. Denham while your case is under consideration.
15. On November 18, 1948, Mr. Denham had a talk with the plaintiff. On the following day he sent the following memorandum to Mr. Shaw:
I had an interview with Mrs. Knotts yesterday afternoon. In this interview I confined myself entirely to the material that was found in her personnel file as it was delivered to me some days ago and attempted to steer away from material that was contained in the several memoranda which have been written by various members of the Personnel staff including Mrs. Amerman and Mr. Shover, and yourself. It develops, however, that Mrs. Knotts was familiar with the Amerman memorandum and was very much incensed over some of the charges that were made in it.
I attempted to review her employment history, beginning with the Small Arms Plant operation and was struck ' with the numerous times she seems to have changed her spot of employment, although she tells me each change was a logical one and brought about through official reorganization programs. I called her attention to' the 57 which she filed with us, particularly as it referred to her RFC employment but was silent on those points which play such a large part in the situation now. She insisted that in her employment with RFC from June through October of 1946 she was given no assignments whatsoever and simply did those things she picked up on her own account when she asked other classifiers to join them in their operations. I called her attention to the fact that this is not square with the findings of the Appeals Board, a copy of which she told me she had seen.
I then went to the question of her original employment here and she then told me that she had disclosed the whole story of her “Unsatisfactory” rating appeal and subsequent “Fair” rating to Mrs. Swain and Mrs. *509 Amerman prior to her employment. On further questioning it develops, however, what she really meant was that someone (either Miss O’Neil or Mrs. Swain) had told her that she had a “Fair” rating from RFC and on the basis of that she assumed they had knowledge of the whole story. A little later she gave the unequivocal assertion she had told the entire story to Mrs. Amerman, including the story of the' “Unsatisfactory” rating, the appeal-and the revision as well as the story about her supervisor having told her there was no work for her and if she did not resign he would find some other way of “getting” her.
This has been a most unsatisfactory and sticky situation which none of us like. There have been mistakes made all. along the line from the time she made her application up to the present. Some of those mistakes are, in my estimation, inexcusable. However, I think Mrs. Knotts is entirely incompetent for the job she is in and told her so. I do not believe she belongs in this class of work in any agency and told her that as well. I suggested that the smart thing to do was find a place in another agency where she would be happy and where her- talents would be appreciated, and that if she did so I would see to it that she gets off on the right foot in her new location. We also discussed the suggestion that has been made that she be terminated as' of November 23rd'pursuant to the change in her status growing out of the failure to obtain Civil Service approval of her appointment following a termination by the RFC in October 1947 because of her “abandonment of position.” I told her I was not familiar with the detailed workings of the Civil Service regulations and did not know exactly what could be done, but that it would be my desire to see her retained here in some work, other than in the Classification Section, for a reasonable time during which she is to be given every reasonable opportunity to find an appointment in some other agency, ix she desires to stay in the Government.
• I impressed her with the fact that she cannot expect to continue to function in the Personnel Division and especially in the Classification Section; that Mrs. Amer-man is the head of that Section and we have a great deal of confidence in Mrs. Amerman; that we have relied upon her to do a very difficult job and she has done so to our satisfaction.' I also attempted to tell Mrs. Knotts we have been rather proud of the cooperation which has extended throughout the staff of the Office of the General Counsel and that we want to do everything we can to *510 avoid unnecessary friction. I advised her to follow the program I had outlined with a view to taking over some temporary work which is available in Mr. Posner’s office and to look for another appointment in the meantime; assuring her that she would be given a reasonable time of two months or so within which to do this.
I told Mrs. Knotts further that, while I did not approve of the general program of the November 23rd termination, unless she was willing to go along as I suggested I would have to change my point of view on that. I also indicated that if she insisted on staying on the job she is now in, she would wind up on March 31st with an “Unsatisfactory” efficiency rating and that was something I also wanted to avoid. She did not indicate what her reaction would be, but I wish you would talk with her and see whether she intends to follow along the lines as suggested. If so, then the matter probably would involve a termination on November 23rd and reemployment for sixty or ninety days subject to renewal, if desirable, in some other Division of the agency.
I think we can well afford to give Mrs. Knotts this type of cooperation in view of all the circumstances which seem to have been terribly garbled from the start. Of one thing I am confident, she is entirely incompetent to do the job which has been assigned to her here.
16. Within a few days of the discussions described in the foregoing two findings, the plaintiff had a nervous breakdown and was treated as a patient at a local hospital for a period of two or three weeks.
17. On December 14, 1948, the plaintiff telephoned Mr. Shaw and told him that she was ready to return to work. She was told by Mr. Shaw that he wouldn’t allow her to return to work until he talked with her physician. The plaintiff reported for work on that day even so, and instead of giving her any work assignment, Mr. Shaw directed her to spend that day reading a copy of the Taft-Hartley law. This assignment was described by Mr. Shaw in his testimony as a “leaf-raking” task.
18. Mr. Shaw did discuss the plaintiff’s condition with her physician.
19. By January 12, 1949, Mr. Shaw became, as he described it in his testimony, “fed up” with the matter, and he prepared the following memorandum for the files:
*511 I have believed that a personal conference with Mrs. Knott’s doctor might contribute much toward determining what action in this case would help her recovery ifrom an apparent illness, while also serving the best interests of the N. L. R. B. Until I can confer with him, I have no authentic information as to the nature of her illness, except that it seems to be of a nervous or mental •character.
However, if we set aside the question of her illness, I now believe that it would not be wise to employ her longer in the N. L. R. B. My recent personal experiences with her all tend to confirm what has been reported by others: that she frequently fails to distinguish between truth and fiction, and that the fictions which she creates not only inconveniences or embarrasses others, but may even jeopardize their effectiveness as public servants. To continue her in the agency would result only in further trouble between employees, and would further jeopardize our relations with outsiders such as the Civil Service Commission and Senator Hoey.
Unless considerations respecting her illness which her doctor may bring up in our forthcoming conference are different from what I anticipate, I proposed to request Mr. Denham to terminate her services on the basis of charges to be filed jointly by Mrs. Amerman and myself.
20. On February 2, 1949, the plaintiff, who had presented -a physician’s statement that she was able to return to her employment, was temporarily detailed by Mr. Shaw to the Industrial Analysis Branch of the N. L. R. B. In his letter ■of instruction to the Acting Chief of that branch, he suggested that she be given time off for interviews with prospective •employers concerning a position outside of N. L. R. B. The work to which the plaintiff was assigned was of a routine clerical nature. This assignment was made pursuant to an .agreement between Mr. Denham and a United States Senator who had interested himself in the plaintiff’s situation. The agreement or understanding was that the plaintiff would be retained in N. L. R. B. for sixty days during which efforts would be made to secure another position for her outside of N. L. R. B.
There were no complaints of any kind about the plaintiff’s work in the assignment described above, but she was engaged in work ordinarily assigned to a CAF-3 employee while she *512 was classified as a CAE-7 employee and received the pay of the higher grade.
21. On or about March 21,1949, the plaintiff was reassigned by Mr. Shaw to. another section. She cooperated very well with the section chief and all other employees of the section from this date until her services were terminated, the details of which will be set forth shortly.
22. On July 6, 1949, Mr. Denham directed a letter of charges to the plaintiff, which had been prepared by Mr. Shaw and Mr. Shover, although signed by Mr. Denham, in the following terms:
The purpose of this letter is to point out specifically the situation which has developed in connection with your employment in this Agency, and to state the steps which necessarily must be taken at this time.
You will recall that on November 18, 1948, you were informed by me that you- had been unable, to adjust yourself properly to the position and situation for which you were employed. A. promise was made at that time to find other work for you temporarily, while you would have time to find a position outside of this Agency. This promise has been faithfully carried out. The conclusion has now been reached that it is necessary to terminate your services with this Agency for the reasons stated below. Should you not resign in the meantime, and if you desire, you should make reply in writing regarding these reasons by July 13, 1949. Unless your reply convinces me of substantial error in fact or substance of the reasons, your services will then be terminated on July 20, 1949.
The reasons for terminating your services which are listed below are typical and indicate the character of difficulties created by your employment. These reasons and the instances cited to illustrate them, are therefore examples, rather than an exhaustive listing of unfavorable acts or characteristics. They do in themselves constitute adequate grounds for your separation. The reasons are:
1. You have fomented, or participated in, discussions and dealings which tend to create or aggravate factions and critical attitudes in one or more persons towards others in the agency.
2. You have made inaccurate or misleading statements.
3. Your comments and activities interfere with, or give the wrong impression concerning the work and character of officials and employees of this Agency.
*513 Examples to illustrate these reasons are shown below.
1. Fomenting,- and participating in, discussions■ and dealings which tend to create or aggravate factions and critical attitudes of one or more persons towards others m the agency.
a. It is apparent that the number of these conversations and the extent to which they go show a lack of discretion on your part and fail to maintain a professional and objective point of view. . It is quite apparent, moreover, that you have either aggressively or voluntarily placed yourself .in such a situation that many of these conversations have been encouraged on your part. Several examples may illustrate.
b. During May, 1948, your specific assignment with respect to the survey of the Office Services Section had been made clear to you. However, you repeatedly became involved in discussions with Mrs. Kay Harrell, Chief of the Section, regarding work which had been assigned to Mrs. Gable. This action not only invoked comment from you that you were extremely embarrassed but it was upsetting to the morale of the Classification Section. Good professional discretion would have immediately directed the conversation in such a way as to lead Mrs. Harrell to take up her problems with Mrs. Gable. However, this you did not do. Finally, after several discussions which you had with Mrs. Harrell, Mrs. Amerman reminded Mrs. Harrell and you that Mrs. Gable was in charge of the work being discussed and that any questions should be addressed either to Mrs. Amerman .or Mrs. Gable. This illustrates a weakness which Mrs. Amerman discussed with you several times. She. pointed out the necessity for adherence to your own work and responsibilities. This type of action prevents the Classification-Officer or Reviewing Classifier from meeting properly the situation which developed.
c. When Mrs. Gable, reviewing classifier, was brought into the Personnel Branch and she was taken to a staff meeting for introduction, you inquired why she ■ was taken to the staff meeting. When you. were told that the Director of Administration had invited her, you commented that the Director of Administration had better be careful if he wanted to keep his job, that you knew who put him in National Labor Relations Board. This type of comment tends to create a critical or antagonistic attitude.
d. You advised Mrs. Amerman, Classification Officer, that according to the Fiscal Officer (Ethelreda Fesmire) ■the classification survey was upsetting to the morale of *514 the Fiscal Section. Yon reported this as a confidential comment and you initiated no steps to get permission to-bring it to the attention of the Classification Officer until requested to do so. Good professional discretion on your part would have called for an effort to place this, conversation on a basis so that the Fiscal Officer would not have discussed it with you as an individual or “hush hush” matter.
e. When the classification survey was being made of the Administrative Statistics Branch, and at a conference attended by you, the Director, Division of Administration made a decision to defer classification work in-one of the units until certain operational procedures-had been reviewed. This decision was confirmed by memorandum which was handed to you. However, you continued to carry on conversations with the Branch Chief and Head of the unit involved or to ask questions-when it had been decided that the work should be set aside temporarily. Furthermore, since you seemed unwilling to follow instructions or requests by the Reviewing Classifier who was acting for the Classification Officer, she suggested that you take up your work problems with the Director of Personnel. You “Lost your temper” (as you stated) and said you would not take up any question with such official but would go over his head since he “by-passed you.” Since you were the junior-analyst in the Classification Section it is assumed that the Director of Personnel’s contacts will primarily be with the Classification Officer, or her alternate. This depicts not only lack of .cooperation but non-observance of proper channels.
Your persistence in discussing problems which were not ready for solution complicated the tasks, of officials and employees concerned. Furthermore, your tendency to discuss matters which are not properly in your area of responsibility and to seek out conversations with officials and employees creates misunderstandings and misapprehensions.
2. Inaccurate or Misleading Statements.
a. In the conversation with me on November 18, 1948, you stated that you had told the entire story of your employment and unsatisfactory efficiency rating at Reconstruction Finance Corporation to Mrs. Amerman as well as the story about your, superior telling you that there was no work for you and that if you did not resign he would find some other way of disposing of your services. Your statement at that time was to the effect that you had told this to Mrs. Amerman at the time of your *515 employment. This story, however, was not related by you at the time of your employment to Mrs. Amerman nor to any member of the Personnel Branch.
b. When making an analysis of the clerical and general administrative work in the Trial Examining Division in May 1948, ;your written report told of a procedure of sending the Trial Examiner intermediate reports to the Government Printing Office for printing. Trial Examiner reports of this agency are not printed by the Government Printing Office and have not been printed by Government Printing Office any time in the last ten years, but occasionally have been mimeographed by that agency.
. c. On July 16, 1948, you were asked by the Classification Officer why you had recommended a CAF-7 grade for Assistant Fiscal Officer position. Your reply was that you had not seen the description. When Mrs. Amerman reminded you that you had written the description, you accused Mrs. Gable of giving you away.
d. In the month of July 1948, you audited the position of Evelyn Cunningham and submitted a typed statement that the position was operating as described with the possible exception that the incumbent by reason of long experience had acquired knowledge and was able to render a great amount of assistance to her superior. Subsequently, a survey by Mrs. Amerman and one by the Organization and Methods Branch revealed that she was not exercising fully the responsibility for initiating personnel actions and maintenance of records of employees in the regional offices, a responsibility recorded in her duty statement.
e. You conducted a desk audit of the position of Administrative Assistant (Maude Klebold) on July 19, 1948. The written report of this audit reveals that the incumbent was operating as described in her duty statement, except that “the only additional responsibility that had been added to her position was being designated as Time and Leave Representative for the Division.” You also stated that the incumbent emphasized the amount of assistance she was able to render to superiors and the amount of responsibility assumed as a result of the long experience with the agency and the knowledges concerning the functions she had acquired. This position was reaudited on October 21,1948, by Mrs. Gable and Mrs. Klebold advised that she did not and never had performed certain duties in her job description, she never attended conferences, nor reviewed outgoing mail, that she did not sign superior’s name to mail, and that *516 •the correspondence she prepared, other’than letters of acknowledgment during Mr. Findling’s' absence was regarding administrative matters, such as personnel, leave, ' etc. The new draft of the duties of the position omitting such duties was approved by Mrs. Kleboíd.' and her superior, on October 27,1948. _
_ f. You stated in conversation with Mrs. Gable that your name had been put up for a CAF-9 confidential position in the Office of the General- Counsel and that you called someone in the Personnel Branch to withdraw your nomination. Investigation indicated that your name had not been presented and that no-call had been made to withdraw your name.
3. Comments and activities' detrimental to world of agency officials and employees. y .
Another reason for terminating your services'.with this Agency is because your comments aiid activities interfere with or give the wrong impression concerning the work and character of officials and employees of this agency. Examples are:
a. You reported that a certain executive outside the agency (Mr. Kyle) had approved of a report prepared by Mrs. Amerman, which report was confidential to the top management in this agency. In fact you went so far as to state that Mrs. Amerman should not show this report to Mr. Shaw, Director of Division of Administration since he would no doubt seek Mr. Kyle’s comments on it before returning it to Mrs. Amerman.’ If true, such a remark would indicate that you had- carried the contents of the report orally or in writing to someone outside the agency who had no right to see such' a report. If not true, this false statement would tend to. reflect discredit upon the Personnel Branch which was working on a confidential program.
b. Another instance, you reported to Mrs.- Amerman early in 1948 that Mr. Shaw had made some administrative errors and that he had endeavored to secure one of your personal friends, Mr. Kyle (referred to previously) to come to this agency as his assistant. At that time, Mr. Shaw had not even decided' that he wanted an assistant. ... ’ .
... . c. You indicated to the Director, Division of Administration that you had been up “on the hill” tó discuss matters of organizational plans concerning’his division. You were not authorized to discuss such á plan, furthermore, the Director had not reached a point where he was ready to announcé plans concerning such organizational matters.
*517 d. You were critical of a picnic which was held by one of the branches of this Agency because a Negress who was employed in that branch attended the picnic.
e. You have accused the Director of Personnel and the Classification Officer of being responsible for your illness during the past several months and for exorbitant doctor bills resulting therefrom. A similar comment was made against officials of the Reconstruction Finance Corporation at the time that organization found your services unsatisfactory. •
f. You have given to others the impression that the Director, Division of Administration, the Director of Personnel and the Classification Officer have said that your illness would place you in a padded cell in St. Elizabeths Hospital.
These brief examples are samples of various acts and statements on your part which taken altogether constitute compelling reasons for terminating your services. I regret that it has not been possible for you to adjust properly to the needs of our agency, but the disrupting effects of your continued employment in this agency can no longer be tolerated. You have been granted full freedom to seek employment elsewhere during the past six months, although originally you were promised only a 60-day period of grace. . That period of grace must now be terminated.
. 23. The plaintiff replied to the letter of charges on July 13, 1949. Mr. Denham considered the plaintiff’s reply and on July 19,1949, he directed the following letter to the plaintiff terminating her services at the close of business on July 20,1949: .. .
■ I have before me your letter of July 13, 1949, which, I assume, is your answer to the statements contained in the letter of July 6, 1949, notifying you of the termination of your services with this Agency on July 20,1949.
As you undoubtedly realize, most of the facts recited in the letter of July 6 have been before me, more or less constantly, for the past eight or ten months. Every element of your case has received more than ordinary .study and consideration, and I find nothing now in your letter of July 13, 1949 which is new material, or which in any manner justifies an alteration of the position taken on July 6.
As you undoubtedly recall, it was in the latter part of 1948 that I told you it would be impossible for us to retain you in the service of this Agency, and completely impossible to retain you in the services of the Personnel *518 Division of the agency. At that time, I told you we would transfer you to some other operation and would carry you for sixty days, during which time wé anticipated that you would spend considerable effort in attempts to find placement in some other agency of the government, or outside of the government. You may recall that this arrangement was made at the instance of one of the Senators of your state, who had interceded in your behalf.
You have had ample opportunity to present your case to me, personally, and in writing, and have done so. Since there seems to be nothing in the picture that has not already been thoroughly considered, I can see no reason for an additional formal and time consuming hearing. I must, therefore, deny your request for such a hearing.
You have been handed your efficiency rating for the period ending March 31, 1949. If you are not satisfied with that rating, you have the privilege of appealing to the Civil Service Commission along lines with which I think you are familiar.
In view of all the foregoing, your services with this Agency will be terminated at the close of business, July 20,1949.
24. The plaintiff had received an efficiency rating of “Unsatisfactory” for the period of April 1, 1948 to November 15, 1948, some time prior to her dismissal. This rating is shown on plaintiff’s exhibit 14, and although it was originally based upon plaintiff’s performance for the period from April 1, 1948 to March 31, 1949, the typewritten date March 31, 1949 was lined through, and the date November 15, 1948 was substituted. Thereafter she appealed her efficiency rating. Her rating was, after hearing before an efficiency rating appeal panel, changed to “Fair.” The plaintiff was notified of this change by letter from the Chairman of the N. L. K. B. on October 26, 1950. Mr. Denham, in August 1950, forwarded the decision of the appeal panel, together with his comments on each element of the plaintiff’s work performance, to the Acting Chairman of the N. L. B. B., as follows:
In view of the fact that the Board has relieved me of the not always pleasant duties associated with the Administrative Division, I am handing you herewith the report of an appeal panel having to do with the efficiency rating appeal of Elizabeth P. Knotts, who was discharged about a year ago for the good of the service, *519 chiefly arising from inefficiency and what may generally be described as “trouble making.”
The Knotts case was brought to my attention in the fall of 1948,. when it became necessary for Mrs. Amer-man, under whom she worked, to have her assigned to some sort of leaf-raking job because of her inefficiency. In the first place, we discovered for the first time that she had been let out of the RFC shortly before her employment here with an unsatisfactory efficiency rating, from which she appealed and, as I recall, was not successful. The matter became so much of an issue that Senator Hoey of North Carolina interested himself in it in view of the fact that Mrs. Knotts’ father and he had been very close friends.
About that time I found it necessary to intervene in order to find out what it was all about. I had two interviews with her. She obviously was wholly unequipped to do the job of classifier but insisted that she be retained in that job and at the Grade 7 which she then held. About this time, there were numerous interventions by Mr. Spain, who is the Administrative Assistant to Senator Hoey, and a couple of interviews with him and with the Senator, in which it developed that the woman is apparently devoid of any sense of truthfulness and is almost a psychiatric case. At the request of Senator Hoey’s office, I took her away from that work and assigned her to something in Affidavit Compliance, with the understanding that she would be kept there for 60 days, during which time Mr. Spain agreed that he would find her employment elsewhere. During this period she was paid at the Grade 7 rate although she was doing Grade 3 work. At the expiration of the 60 days, Mr. Spain had found nothing for her and apparently was getting to be a little bit annoyed over the manner in which she was haunting.their office with some rather weird tales about what was going on here. However, I kept her on for quite a while longer and finally Spain apparently abandoned the case, and the next thing we knew the Federal Workers Union had intervened. They, too, lasted only a short while and for some reason they lost their interest in the case and the last I heard of it she had enlisted the aid of one of the Congressmen — I think it was Congressman Barden — who maintained an interest in the case only long enough to find out what it was about, when he apparently abandoned it, also.
She was given an unsatisfactory rating by Mrs. Amer-man and-was confirmed in that rating all along the line by the various reviewing officials. An appeal was taken, *520 with Sam Merrick and Edmund J. Flynn as the Appeal Panel. Merrick and Flynn have recommended some substantial upgrading from her “Unsatisfactory” rating, as-you will note from their comment on the 9 elements that are set out in the attached-report.
I am unable to agree with the recommendations for upgrading made by either Mr. Merrick or Mr. Flynn.. This position arises from the fact that I did have occasion to become very closely acquainted with the case and1 most of its elements. I will comment on the 9 elements-for whatever value my comments may have, because apparently the final review of the appeal is going to-rest with the Board now that these matters are not within my jurisdiction.
Item 3 — Skill in application of technique and procedures. The rating- given was “minus” — Merrick recommends retaining that mark and Flynn would rate her as “adequate.” As I have said, she was wholly unequipped for her job, and because of that I would not change the original rating.
Item 5 — Attention to broad phases of assignments. I am not familiar with this, phase of her work, except as Mrs. Amerman comments on it. I might be inclined to-go along with the Appeal Panel and give this item a checkmark, although my' hunch is that she was considerably less than adequate in this phase of her work.
Item 9 — Accuracy of judgment or decisions. In this phase, Mrs. Knotts decidedly was. deficient, as evidenced by her general conduct and her lack of efficiency in carrying out the position to which she was assigned. I do not think the original. “minus” rating should be disturbed.
Item 10 — Effectiveness in presenting ideas or facts. Here, too, our experience with Mrs. Knotts was that while she was very effective in relating something which she wanted to put over, in the conduct of her work and in her contacts here the effectiveness in presenting ideas and facts Was a distortion of ideas and facts made to fit whatever circumstance then presented itself. This utter lack of dependability rates nothing more than a “minus” on this item.
Item 12 — Rate of progress on or completion of asign-ments. The rate of progress on or completion of assignment is checked in the original rating and by the two members of the panel. This, I think, should not be disturbed. ...
*521 Item 15 — Effectiveness in. meeting and dealing with1 others. The original rating was “minus.” Merrick' wants to upgrade that to a plus and Flynn to a check-mark indicating;adequacy.,- Practically the same comments that were made concerning Item 10 apply her. [sic]. Effectiveness'in meeting and dealing with others is only good when it deals with honest presentations of circumstances ;under discussion and accuracy of basic facts as a foundation for dealing with other people. These were all missing and, consequently, in my opinion,, the original rating of “minus” should not be disturbed..
Item 16 — Cooperativeness. From all I can gather and from my impression at the times I met her and have had to discuss her affairs with Mr. Spain, I would-say ■■ that she is utterly lacking :in consistent cooperativeness.
■ Item 17 — Initiative. I think possibly this item could 'be marked with a .checkmark. She undoubtedly had con-. :siderable initiative in handling her own affairs, although "Unfortunately much of it was misplaced. I get the impression that she attempted to do things that she was'. not called upon to do dr that were entirely outside of. ‘her sphere. On this basis, I would be inclined to go:;along with the Appeal Panel and give her an adequate, rating.
Item 19 — Dependability. This characteristic is en-; tirely lacking and on that item I again would not disturb ;the “minus” rating given.
The foregoing represents the treatment I would give this report based upon my personal knowledge of the-, .case, as well as the record's which are in the files. The' result of this would' be to continue the adjective rating--of “unsatisfactory.” ■ ;
The foregoing is for your information and for such' use as you may care to make of it. ;
25. The plaintiff received no' efficiency rating on her work ■íor the period from November 15, 1948, to July 20, 1949.'
26. Mr. Denham told the plaintiff some time before her «dismissal that if she wished to remain employed at N. L. E. B.,' .at a CAF-3 salary doing the work described in finding 21, 'he would be willing to continue her in that position át that -salary. In his testimony Mr. Denham- stated that the charges «came only because of the lack of success in trying to convince ;the plaintiff that the N. L. E. Bi was quite willing to keep' •her on the job she was doing but not' at the grade which :she had been paid,-because the work she was then doing was; *522 Grade 3 and she was paid for Grade 7. He further testified that she would have been in an atmosphere different from that where the trouble had occurred, an atmosphere in which she apparently at that time was doing satisfactory work and in which her relations with other people were quite satisfactory and led to no complaints.
27. Shortly after Mrs. Gable was employed by the N. L. R. B., the plaintiff’s desk was moved, along with Mrs. Gable’s, from the seventh floor of the building to the third floor. Mrs. Gable moved back to the seventh floor after a short time where she shared the office with Mrs. Amerman, as the plaintiff had done prior to Mrs. Gable’s employment. Plaintiff remained on the third floor.
28. The plaintiff’s work assignments were then gradually withdrawn by Mrs. Amerman and transferred to Mrs. Gable so that by July 1948, practically all assignments previously given her had been completed and no additional assignments were made by Mrs. Amerman. For a period of three or four months she was without an. assignment, so that to occupy herself she read copies of job specifications which she had previously completed.
. 29. One evening after the five o’clock closing hour, a colored male employee of N. L. R. B., named Carl Snipes, came into the plaintiff’s office on the third floor to inquire concerning the status of his job classification. She was alone in that part of the building and felt uneasy. She was unable to answer his inquiry because this was one of the work assignments which had been withdrawn from her by Mrs. Amer-man, and since she knew that Mr. Shaw sometimes worked late she telephoned him concerning the matter. The next day Mrs. Gable sharply criticized the plaintiff for having “gone over their heads” to talk to either Mr. Shaw or the colored employee. She asked, in effect, what the plaintiff was trying to do; “are you trying to beat Mrs. —’s time with Carl Snipes?”
30. In July 1948, Mr. Shover, Director of Personnel, planned an office picnic. The plaintiff did not plan to attend, but she had arranged to drive several employees to the picnic since she lived in the vicinity where the picnic was to be held, and she so told Mr. Shover. About a half-hour before clos *523 ing time, Mr. Shover telephoned the plaintiff saying that he had made other plans concerning transportation and asked her to take several colored people instead of the others mentioned . above. The plaintiff is a white person, a native of North Carolina, and she refused to do so.
31. After the incident of the office picnic, Mr. Shover told certain- employees of the N. L. R. B. that he did not want them to have lunch with the plaintiff, as they frequently had done previously, or to have anything to do with her.
32. By November 11, 1948, more than seven months prior to the issuance of the letter of charges, Mr. Shaw concluded that the plaintiff could not remain in her position regardless of whether Mrs. Amerman was justified in viewing plaintiff’s work unfavorably. (See finding 13.)
33. Both Mr. Shover and Mr. Shaw requested the chief of the section where plaintiff was working after March 1949 to report to them any derogatory matter which might come to his attention concerning plaintiff.
34. At least seven months prior to. the issuance of the letter of charges, Mr. Denham, the General Counsel, had concluded that it was impossible for him to retain the plaintiff in the agency and completely impossible to retain her in the Personnel Division. (See finding 23.)
35. Mr. Denham did not have any personal knowledge about the basis for the charges preferred against the plaintiff, but relied entirely on information which came to him from Mrs. Amerman, Mr. Shover and Mr. Shaw, in addition to the examination by Mr. Denham of the plaintiff’s personnel file and his conversation with her.
36. After the plaintiff’s dismissal, at the request of her attorney, Mr. Shaw gave to such attorney a letter of recommendation for use by her in obtaining other employment. Such letter of recommendation is dated June 7, 1950, and is quoted in full:
June 7,1950
Recommendation

To 'W^om It May Concern:

It is our understanding that Mrs. Elizabeth P. Knotts is applying for Federal employment in some of the following fields, namely, Office Services, Information, *524 ' Administrative Assistant, Receptionist, processing correspondence, or handling Mails and Files.
Mrs.. Knotts was formerly employed by this Agency from November 24,1947 to July 20,1949. She came into employment here as a classification analyst CAF-7. Our records indicate that her efficiency rating for the first 6 months of her employment was “Good”.
In the capacity as a junior classification analyst, Mrs; Knotts surveyed a number of positions, assembling data needed by the Classification Officer to determine the complexity and difficulty of each job. After a period of somewhat less than a year, we found that this arrangement had certain disadvantages, and that the needs of the Agency would be better served by éngaging a moré experienced assistant to work with our Classification Officer. It also became apparent that the circumstances did not justify retaining also a junior analyst. Arrangements were made at that time to give Mrs. Knotts an opportunity to find employment elsewhere.
While Mrs. Knotts was seeking another position, she was temporarily assigned to clerical work in the Division of Administration. This work she carried on in an adequate manner. It is our opinion that Mrs. Knotts is qualified for, and could perform satisfactorily in, a junior level position in any of the fields of work enumerated in paragraph one.
CaRROll K, Shaw, Director, Division of Administration.
37. From all the evidence it is found that the plaintiff was dismissed from her position at N. L. R. B. on July 20, 1949, by Mr. Denham because of the arbitrary, capricious and malicious actions of Mrs. Amerman, Mr. Shover and Mr. Shaw, concurred in by Mr. Denham, in order to make a permanent place in the Personnel Classification Section for Mrs. Gable.
38. After deducting earnings from other employment received by the plaintiff from July 21,1949, to April 17,1951, the plaintiff would have earned during that period, at the salary rate she was receiving at the time of her dismissal, the sum of $6,969.01.
CONCLUSION OE LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter *525 of law that plaintiff is entitled to recover, and it is therefore adjudged and ordered that she recover of and from the United States from July 21, 1949, to April 17, 1951, six thousand nine hundred sixty-nine dollars and one ceát ($6,969.01).

 “Attached Is a report concerning Elizabeth P. Knotts, Position Classifier, Grade CAF-7. In view of this report, I believe that Mrs. Knotts has not proved suitable as a Position Classifier, and to continue her services would not be to the best interests of the office. Consequently, I recommend that she be relieved of her assignment In the Classification Section immediately.
“It Is hoped that the use of one well qualified Position Classifier in addition to Mrs. Amerman will be sufficient for our needs for the time being, and, therefore, the CAF-7 position will not be filled.”