Lillian H. HORNE

v.

The UNITED STATES.

No. 400–65.

United States Court of Claims.

Dec. 12, 1969.

## OPINION

### PER CURIAM:

This case was referred to Trial Commissioner Saul Richard Gamer with directions to make findings of fact and recommendation for conclusions of law under the order of reference and Rule 57(a) [since September 1, 1969, Rule 134(h)]. The commissioner has done so in an opinion and report filed on August 15, 1969. Neither party has filed exceptions to the commissioner's opinion and report and the time for so filing pursuant to the rules of this court has expired. On October 15, 1969 the defendant filed a motion that the court adopt the commissioner's report as the basis for its judgment in this case. Plaintiff has filed no response to this motion and the time for so filing pursuant to the rules of the court has expired. Since the court agrees with the commissioner's opinion, findings and recommended conclusion of law, as hereinafter set forth, it hereby grants defendant's motion and adopts the said opinion, findings and recommended conclusion of law as the basis for its judgment in this case without oral argument. Therefore, plaintiff is not entitled to recover and the petition is dismissed.

### OPINION OF COMMISSIONER

GAMER, Commissioner:

On November 27, 1964, plaintiff, while in her one-year probationary period, was separated from her position with the Manhattan, New York, District of the Internal Revenue Service. Plaintiff had been appointed to the position on June 15, 1964. Her appeals to the Civil Service Commission were unsuccessful. Her petition here alleges that her discharge was arbitrary, capricious, and unlawful, and seeks judgment for loss of salary.

A detailed consideration of the record herein, following a full trial,[1] fails to disclose any basis for recovery.

---

1. By order of January 16, 1967, the court denied both defendant's motion and plaintiff's cross-motion for summary judgment.

No procedural defect in effecting plaintiff's separation has been shown. The only pertinent regulation applicable at the time was Section 315.804 of the Civil Service Regulations,[2] which prescribed the procedure for the termination of employment of probationers for unsatisfactory performance or conduct. The quite summary procedure authorized was here followed. The regulation simply provides that the agency shall set forth its "conclusions as to the inadequacies of [the probationer's] performance or conduct."[3] By letter of November 17, 1964, to plaintiff, the agency notified her that, effective November 27, 1964, she would be separated because she had been "uncooperative" with agency officials in that she had "unnecessarily impeded audit procedures" in connection with an audit conducted of her own income tax returns. Such audits were routinely made as part of the investigation of all IRS employees in plaintiff's category (tax technician) prior to the expiration of their probationary periods. The letter went on to state, after a full recitation of the acts and events upon which the agency's "conclusions" were based, that:

> As a Tax Technician, one of your major responsibilities is to obtain the cooperation of taxpayers in the enforcement of provisions of the Tax Code and to encourage voluntary compliance. By your actions in regard to your own audit you have shown that you would be unable to perform your duties suitably and conscientiously, and are, therefore, being separated to promote the efficiency of the Revenue Service.

In thus stating that plaintiff's uncooperative conduct in connection with her own tax audit demonstrated an inability to perform the duties of a tax technician suitably and conscientiously, the agency was manifestly in compliance with the "conclusions" requirement of the regulation. Actually, the letter, setting forth in considerable detail plaintiff's various acts (and failures to act) upon which the agency's conclusions were grounded, went further than required by the regulation.

■ Apparently, as shown by her appeal to the Civil Service Commission, plaintiff was under the misconception that she was entitled to advance written notice of the proposed dismissal, presumably in the nature of charges, to which she had a right to reply, for that was one of the points she made in her appeal.[4] (As shown, the notice did set forth the date upon which the termination would become effective.) However, unlike employees with permanent civil service status in their positions, who are entitled to the protections of the Lloyd-LaFollette Act,[5] including advance written notice based on charges, as well as the opportunity to reply, probationary employees are subject to the summary dismissal procedure described in the above-mentioned Civil Service regulation. Dargo v. United States, 176 Ct.Cl. 1193 (1966). Plaintiff seemingly now concedes this, for the contention is no longer pressed.

2. 5 C.F.R. § 315.804 (1964).

3. "Section 315.804 Termination of probationers for unsatisfactory performance or conduct.
   "When an agency decides to terminate an employee serving a probationary or trial period because his work performance or conduct during this period fails to demonstrate his fitness or his qualifications for continued employment, it shall terminate his services by notifying him in writing as to why he is being separated and the effective date of the action. The information in the notice as to why the employee is being terminated shall, as a minimum, consist of the agency's conclusions as to the inadequacies of his performance or conduct."

4. She stated: "No advance or written notice of proposed action was initiated by the Agency."

5. 37 Stat. 539, 555, as amended by the Act of June 10, 1948, 62 Stat. 354, 5 U.S.C. § 652(a) (1964).

Similarly, the contention plaintiff has sometimes asserted that, because she had, since 1952, served in various federal positions in which she had attained civil service status, she was not subject to the summary dismissal procedure applicable to probationers, is also now apparently abandoned. Plaintiff concedes that her previous positions, which were of the secretarial-stenographic type in agencies other than the IRS, involved duties of a different nature and character than that of the tax technician position for which she was employed by the Internal Revenue Service. Thus, she was properly subject to a one-year probationary period in her new position.[6] Dargo v. United States, *supra*.

Consequently, the only basis upon which plaintiff's dismissal can be attacked is on the merits, and plaintiff's main thrust is now so grounded. She says that, despite the conclusion of the agency that she was "uncooperative" because she had "unnecessarily impeded audit procedures," and that therefore she would not, in the agency's opinion, be an employee who could "perform [her] duties suitably and conscientiously," she had in fact been cooperative and her attitude and conduct had been proper.

Considering the strong presumption that public officials act in good faith, an employee carries a heavy burden in attempting to show, in cases of this kind, that his discharge was so lacking in rational support that it must be characterized as arbitrary or capricious. Greenway v. United States, 175 Ct.Cl. 350, cert. denied, 385 U.S. 881, 87 S.Ct. 167, 17 L.Ed.2d 108 (1966); Knotts v. United States, 121 F.Supp. 630, 128 Ct.Cl. 489 (1954).

It is settled that "the courts cannot be drawn into the merits of controversies relating to competence. Judg-ments as to an employee's qualifications or the satisfactory nature of his services must necessarily rest with the agencies and not with the courts. [Cases cited] All the courts can do in questions of this kind is to make certain the agency's action represents honest judgment." Dargo v. United States, *supra* at 1206.[7] And here the record, including the testimony of the official who initiated the dismissal action, affirmatively shows that the agency's action was taken in good faith and, in its sound opinion, to promote the efficiency of the Service. Further, the evidence demonstrates that such determination and action were not so lacking in factual support as to compel the conclusion that they were without any reasonable foundation and therefore arbitrary and capricious.

For one attempting to demonstrate her fitness for the tax technician job to which she was aspiring, plaintiff certainly acted in a strange manner. In notices (a telegram and a letter) of May 28, 1964, which plaintiff received, stating that she had been selected for appointment, plaintiff was specifically advised that the appointment would be "subject to the results of a character investigation and an audit of your income tax returns filed for three prior years" and that "the first year of this appointment will be a probationary period." Actually, in anticipation of her selection, an employee audit had already been initiated of plaintiff's 1962 and 1963 (joint) returns. Plaintiff was so advised by letter of May 7, 1964, from the Brooklyn, New York, District Director. The letter stated that additional information was necessary to verify her reported tax liabilities, and requested that she bring the records she used in computing her taxes for such years to the District Director's Office on May 11, 1964. The letter further stated that information was specifi-

---

6. The official title of the position to which plaintiff was appointed was "Tax Technician (Trainee)."

7. The Civil Service Commission also took the position that it would not entertain an appeal based on a probationer's inadequate performance or conduct on the job.

cally required to support the deductions plaintiff had taken for interest expense, as well as for medical and dental expenses. Plaintiff's conference appointment, the letter advised, was with Miss Jean Kaufman, an experienced tax technician who was then assigned to conducting audits of the returns of IRS employees.

On May 11, 1964, plaintiff did appear for the conference, but brought no data at all with respect to 1962. As to 1963, all she brought was partial verification (medical bills and canceled checks) of her medical expenses (around $800 out of total claimed expenditures of over $1,700). Some canceled checks to credit unions, finance companies, and stores were submitted as proof of loans and installment purchases. However, because there was no showing as to what part of the total check amount, if any, represented interest, these were not accepted as interest expense verification. In justification for the paucity of verification material presented, plaintiff explained that she had recently moved from Washington, D. C., to the New York City area and that the papers she required could not be located. Miss Kaufman explained to plaintiff, however, that the loss of the papers plaintiff felt she needed would not necessarily prevent verification since experience indicated that, in such cases, the writing by the taxpayer of a few short notes to the doctors or hospitals involved to obtain copies of their bills or statements of payments, or, with respect to the interest payments claimed, to the lenders to obtain statements of the loan accounts, invariably promptly produced acceptable verification.[8] Similarly, plaintiff was also asked to obtain verification of the deductions claimed with respect to charitable contributions and taxes. Plaintiff agreed she would write such letters as Miss

Kaufman described immediately, and, since it was expected that replies thereto would be received in about two weeks, it was further agreed that another conference would be held in Miss Kaufman's office on May 26, 1964, to review the material and possibly to complete the audit.

Despite their continued best efforts to arrange for another meeting with plaintiff, however, that was the last that Miss Kaufman or anyone else in the Brooklyn District Office ever saw of plaintiff. By letter of May 25, 1964, the day before the agreed-upon conference date, plaintiff wrote to Miss Kaufman that she was still unable to locate the missing papers. She consequently requested a postponement, but stated she hoped that "in a few days" she could obtain "all the necessary documents, so as not to delay my entrance on duty with your Service any longer." Nothing was mentioned above having written the letters she had promised to send, nor was any new conference date suggested.

Hearing nothing further from plaintiff "in a few days," Miss Kaufman, by letter of June 12, 1964, reminded plaintiff that the information she had submitted was insufficient to complete the audit, and asked plaintiff to telephone her on June 15, 1964.

Miss Kaufman did not receive the requested call on June 15, 1964 (that was the day plaintiff was appointed to her position). However, the next day plaintiff wrote to Miss Kaufman, stated that the Baltimore, Maryland, IRS Office, where she had filed her 1963 return, was also examining it, and requested that Miss Kaufman's audit "be withheld" until the Baltimore District completed its examination. Plaintiff further stated that her missing papers still had not been located, "[b]ut in order not to delay your processing further," she re-

---

8. Plaintiff was claiming total medical and dental expenditures of $1,223.71 for 1962 and $1,714 for 1963. Interest expense deductions of $299 and $450 were being claimed for 1962 and 1963, respectively.

quested a copy of her 1962 return (being unable to locate her own copy), "so that I may submit what information I have, if any, or justification therefor."[9] There was still no indication the plaintiff had written any of the verification letters she had promised to send.

By letter of June 22, 1964, Miss Kaufman sent plaintiff the requested copy of the 1962 return, stated that she would like to complete the audit "as soon as possible," and advised that if plaintiff could not make a personal visit, the verification data should be mailed to her.

Another two weeks passed without any communication from plaintiff. The Brooklyn District officials then decided to contact the Manhattan District Office, where plaintiff was employed and was taking her training course, and request that that office speak to plaintiff and encourage her to communicate with the Brooklyn officials and assist them in completing the audit. Accordingly, on July 6, 1964, Miss Kaufman telephoned plaintiff's supervisor at the Training Branch of the Manhattan Office, explained the situation to him, stated she considered it desirable to have another conference with plaintiff, and solicited his aid in having plaintiff come to the Brooklyn Office, or at least contact her by telephone. Miss Kaufman was assured that trainees could take off such time as was necessary in connection with matters pertaining to their own audits. After conferring with plaintiff, a Manhattan Office official (one of plaintiff's instructors), advised Miss Kaufman the following day that he had relayed Miss Kaufman's message to plaintiff, but that plaintiff stated she would mail the verification data to Miss Kaufman.

Plaintiff's supervisor, apparently having followed up the matter about a week later, and having ascertained that plaintiff had still done nothing about the matter, was assured by plaintiff that she would send in the papers immediately. The supervisor then again so advised Miss Kaufman.

By letter of July 14, 1964, plaintiff forwarded to the Brooklyn Office certain data which she referred to as "information sheets regarding specific items on the returns." The sheets consisted only of explanations as to how the deductions on the returns had been computed. These were substantially the same explanations plaintiff had already made at the conference as long ago as May 11, 1964. No independent verification materials were submitted, nor again was there any indication that plaintiff had sent any of the letters she had promised to send over two months ago.

Concluding that plaintiff was not cooperating and that further delay was unjustified, Miss Kaufman decided to complete the audit on the basis of the data she had. The amounts of the deductions verified or otherwise allowable were insufficient to exceed the standard deductions. Accordingly, the claimed deductions were disallowed and instead the standard deductions allowed for both years. Plaintiff was so informed by letters of July 21, 1964, from the Brooklyn District Director. The resulting recomputations showed deficiencies of $164.43 for 1962 and $443 for 1963.[10] The letters further advised that, if plaintiff wished, she could discuss the matter in person with the examining office, or have an informal conference with an independent conferee.

By letter of August 1, 1964, plaintiff requested reconsideration of the matter "by conference or any other means or

9. The letter stated that plaintiff had unsuccessfully attempted to reach Miss Kaufman by telephone both on June 15 and 16. The record contains no satisfactory explanation for any such inability, since Miss Kaufman was on duty both days and her telephone was covered at all times.

10. Withholdings for 1963 were in such amounts as to require the payment of only $48 to liquidate the 1963 deficiency.

method you deem necessary" (although, because of her training program, she stated she preferred that the matter be handled "without a personal visitation on my part, if at all possible"). The letter went on to recite that the deficiency report was "unreasonable in view of the circumstances," that the "audits were occasioned by my acceptance for employment with the Internal Revenue Service" and that "I find this additional taxation or employment fee is much more than I bargained for * * *." Again she attached "information" sheets containing substantially the same deduction explanations previously made.[11]

The matter was then assigned to a staff conferee at the Brooklyn Office, who, since plaintiff indicated a willingness to confer about the matter, sent plaintiff an "Invitation to Conference" letter dated September 5, 1964. However, by letter of September 13, 1964, plaintiff requested that the matter be reviewed on the basis of the data already submitted.

The staff conferee then advised plaintiff by telephone that the information already submitted was insufficient to warrant greater allowances, and invited her to a conference to review the entire matter. However, although she had previously indicated a willingness to have a conference (which caused the case to be assigned to a staff conferee), plaintiff now declined the invitation.

Accordingly, plaintiff's case was referred back to the Audit Division for the issuance of formal deficiency determinations. Letters containing such determinations were sent on October 6, 1964.

The Brooklyn officials then decided to call plaintiff's case to the attention of Mr. Peter Dillon, the chief of the branch in the Manhattan District Office to which plaintiff was assigned. Dillon immediately spoke to plaintiff about the matter. Dillon was not familiar with or concerned about the details of plaintiff's tax problems. What he was concerned about was plaintiff's apparent attitude and failure to cooperate. Plaintiff told him that the delays in the completion of her audit were due to her missing papers, that she was still searching for them, and that just as soon as she could locate them, she would mail them to the Brooklyn District Office. Dillon advised her of the Brooklyn District's concern. He told her that the officials there stood ready to see her immediately. Plaintiff stated she could not go to Brooklyn at that time because (apparently considering the matter as a personal one) she had no leave. However, Dillon stated he would allow her such time as was necessary for the purpose, without charging it to leave. Plaintiff responded that other engagements prevented her from going immediately, but that she would mail some verification data to the Brooklyn Office the following day, and would attempt to visit it the day after.

By the close of the interview, Dillon was troubled by what he felt constituted evasive conduct on plaintiff's part. In any event, he advised the Brooklyn officials of plaintiff's statements that she would both forward further data and attempt to visit them personally to enable them to close their audit file. However, when Dillon's subsequent follow-up with the Brooklyn officials disclosed that plaintiff had done neither (as the Brooklyn officials had anticipated), he once more conferred with plaintiff, told her of his concern about her failure to do as she had promised, and advised her of the serious nature of the matter. Plaintiff then stated that she had no other data to submit, and that she would promptly mail

---

11. There were a few changes as follows: (1) for 1963, plaintiff claimed three more charitable contribution deductions; (2) in support of the claimed 1963 interest expense deduction, which included $200 paid to credit unions, she submitted "a machine tape" in the amount of $122.20 from one union; and (3) agreed that $278.24 previously claimed as health and accident insurance premiums was not allowable, since such amount actually constituted premiums for life insurance.

her check to pay the deficiencies in full (which plaintiff did). As she had stated in her letter of August 1, 1964, to the Brooklyn Office, plaintiff reiterated to Dillon, however, that she felt the amount involved constituted the exaction of a high employment fee by the Internal Revenue Service, a statement which Dillon felt reflected an attitude which was wholly improper.

Dillon ultimately concluded that the audit of plaintiff's returns disclosed attitudes which would be incompatible with satisfactory performance by a tax technician. Such an employee would have constant contact with the public. One of her important duties would be to obtain the cooperation of, and voluntary compliance by, taxpayers when their returns were being audited and questions raised with respect thereto. With the attitude toward the Service, and the lack of cooperation plaintiff had herself displayed in connection with the audit of her own returns, he concluded that she would make a poor representative of the Service. Accordingly, he initiated her separation by the District Director by the letter of November 17, 1964, as above set forth.

■ Certainly as the above review amply demonstrates, the good faith action by the Service in separating plaintiff for the good of the Service was well within the ambit of permissible agency discretion and in no way can be labeled arbitrary or capricious. And this is so whether or not others might reasonably have taken different or less drastic action with respect to plaintiff. " * * * such matters as the appropriate disciplinary action to be taken normally lie within the agency's discretion." Dargo v. United States, *supra* at 1207.

Plaintiff further says she was proving herself to be a technically competent employee but was nevertheless discharged simply because she had a tax controversy with the IRS. This, she says, does not constitute, under the regulation, "performance or conduct on the job." She was doing nothing impermissible, she says, in claiming deductions, even if it turned out she could not substantiate them. Such inability, she argues, is not unusual taxpayer conduct. It would be unfair, plaintiff urges, to hold a competent IRS employee to a higher standard of conduct in this respect than any other taxpayer.

■ The above review and analysis of plaintiff's relations with her agency with respect to the audit of her tax returns refute the contention. Plaintiff was not discharged because she had, as she says, "a personal tax controversy with the I.R.S." As plaintiff herself points out, many taxpayers fail to substantiate deductions. This is also true of IRS employees and is not in itself considered as any indication of dishonesty. It is especially true of new IRS employees, who may not be familiar with the tax laws or regulations. In this respect, the audit of the past years' returns also serves as an educational tool and as part of their training. What plaintiff was discharged for, as the letter of termination explicitly stated, was her attitude, obviously an important job ingredient. That attitude indeed left much to be desired, as was amply illustrated by plaintiff's considering the disallowance of her unsubstantiated deductions as the exaction of an "employment fee," thus in effect impugning the good faith of her agency-employer. It was further illustrated by her uncooperative conduct, as demonstrated by her several promises to supply substantiating data and then apparently making little or no effort to obtain such data, as well as by her statements that she desired or was willing to have personal conferences but then not following through with respect thereto, and indeed actually declining to attend such conferences when specifically invited to do so. To the agency officials, it almost seemed, not unreasonably, that plaintiff was, for reasons best known to herself, deliberately engaging in dilatory tactics. Technical competence is not the sole test of job qualification. Cf. Ruder-

er v. United States, 412 F.2d 1285, 1287–1288, 188 Ct.Cl. 456, 459–460 (1969).[12]

█ Finally, plaintiff argues that she was discharged for reasons other than those set forth in the termination letter of November 17, 1964. The contention is grounded upon the fact that, after he was drawn into the matter of plaintiff's personnel problem and had his conferences with plaintiff, Dillon, prior to arriving at a final conclusion on the question of whether he should recommend plaintiff's dismissal on the audit bases indicated, inquired of plaintiff's supervisor concerning her on-the-job performance. The supervisor reported that technically, plaintiff was performing competently. He further stated, however, that her attitude toward her supervisor was not one of being willing to consult with him freely, and that, consequently, she failed to so consult with him on the more complex problems which he felt called for such consultation. She tended, he said, to operate alone and to fail to seek help. Dillon felt that the work traits the supervisor described reinforced his conclusion that plaintiff had some of the weaknesses which the audit of her returns had uncovered. It was then that he recommended to the District Director that plaintiff be dismissed for the reasons growing out of the audit of her returns. Accordingly, plaintiff now says she was discharged for the reasons, *inter alia*, that she was not free and willing to consult with her supervisor and failed to consult with him on matters concerning which he felt she should; that she failed to seek help; and that she operated alone, none of which reasons were set forth in the termination notice.

This, she argues, violated the pertinent regulation hereinabove mentioned, requiring that the notice set forth the agency's "conclusions as to the inadequacies of [the employee's] performance or conduct."

The contention cannot be accepted. Clearly, plaintiff's discharge was based only upon the conduct and attitudes she displayed in connection with her audit. That other work traits she exhibited, although not of such character in themselves as to justify dismissal, reinforced the agency's conclusion as to the correctness of its decision concerning the weaknesses she displayed in connection with the audit, is quite immaterial. It was perfectly natural for Dillon, prior to his final dismissal recommendation, to have called for an on-the-job report of plaintiff's performance. There is no showing that, the audit matter aside, Dillon would have recommended the termination of plaintiff's employment during her probationary period on the basis of the supervisor's report, especially in light of the supervisor's conclusion that technically she was proving to be a competent employee. Nor was there any reason why, if plaintiff's on-the-job performance was actually considered to be unsatisfactory, her termination could not have been on such basis, without any need for a cover-up. Considering the entire record, no basis becomes apparent for any assumption that plaintiff's discharge was actually grounded in any part upon the on-the-job work traits discussed by plaintiff's supervisor.

For all of the above reasons, plaintiff is not entitled to recover.

12. As to this contention of plaintiff's, the Civil Service Commission stated: "Your claim that your separation was not due to performance or conduct on the job is without merit. Your actions subsequent to your appointment, as outlined in the letter of November 17, 1964, certainly relate to your conduct on the job."