Kashiwa, Judge,
delivered the opinion of the court:
Plaintiff in this action petitions this court to reinstate him in his former position as a policeman in the Canal Zone Government (hereinafter Canal Zone) and to pay him back wages from the date of his removal. After his removal, plaintiff appealed to the Governor of the Canal Zone. A hearing was held before a hearing examiner and a report made to the Governor. The Governor denied plaintiff’s appeal. Plaintiff then appealed to the Civil Service Commission. The Commission dismissed plaintiff’s appeal on the ground that it lacked jurisdiction to hear an appeal from a *676 non-veteran employee in the excepted service. Plaintiff filed suit in this court on October 2,1973.
The case is before this court on cross motions for summary judgment. We hold for the defendant, allowing its cross motion for summary judgment and denying plaintiff’s motion for summary judgment, for reasons hereinafter stated.
For a better understanding of this case, we refer to certain regulations relating to the Canal Zone concerning “Employee Responsibilities and Conduct” which are not ordinarily applicable to federal employees. Due to the length of the quoted portions, we reproduce the relevant portions below.[1] *677 Particular attention is called to the quoted portion of the “purpose” clause.
An unusual feature of this case is that plaintiff is a citizen of the Eepublic of Panama (hereinafter Panama). It appears that prior to 1964, with a few exceptions, only United States citizens were employed by the Canal Zone, but in 1964 this was changed permitting citizens of Panama to be employed. Plaintiff was one of the first to be hired after the change. He was hired on November 2, 1964. When the incidents hereinafter mentioned occurred, plaintiff was a trainee liaison agent under the Chief of Detectives in the Balboa District of the Canal Zone. The then Chief of Detectives testified before the hearing examiner that the duties of a liaison agent were as follows, Transcript (Tr.) at 11:
Q. What are the duties of a liaison agent ?
A. A liaison agent has several duties. They investigate crime like the regular detectives do and they work more in the Eepublic of Panama than they do in the Canal Zone, that is, they check pawnshops and scrap yards for stolen property. They maintain close liaison with the National Guard and the DENI [National Department of Investigation] and are supposed to keep abreast of goings-on in the Eepublic of Panama, in the National Guard, in the DENI, and elsewhere, particularly political things that could backfire into the Canal Zone. They sometimes take fingerprints and, on occasion, process crime scenes.
Q. When you say that gathering of information, particularly of a political nature, is one of their important duties?
A. That is so, yes. At the time, it was keeping me abreast of what was going on in the Eepublic of Panama politically so that I could report it to my chief, and he, to the Security people.
*678 Since we decide this case only under charge 1 of the five written charges[2] brought against plaintiff on July 12, 1971, by Edward A. Doolan, Personnel Director of the Canal Zone, we limit our preliminary factual statement to a summary of facts relevant to charge 1 only. We find that the best summary statement is the government’s specification of charge 1 which immediately followed the five charges listed in footnote 2. Charge 1 addressed to plaintiff was specified as follows:
1. Failure to remedí information to your superiors that you hnew (or, in view of your position as a Oa/nal Zone police private acti/ng as a liaison agent, you should home hnown) you were obligated to disclose to them. Three high-ranking officers of the Panama National Guard, Colonel Amado Sanjur, Colonel Ramiro Silvera, and Lieutenant Colonel Nenzen Franco, were prisoners in the Cárcel Modelo in Panama City in June 1970, having been incarcerated there after an abortive coup believed to have been led by them the previous December against the Government of Panama. In the early morning hours of June 8, 1970, the three officers escaped and fled into the Canal Zone, where they requested political asylum. The Government of Panama demanded the return of the escapees. The United States Government determined that it could not deliver the fugitives because of its adherence to the United Nations Protocol on the Status of Refugees. The U:S. denial of extradition was communicated to Panama on June 24. The foregoing series of events resulted in a serious strain on U.S.-Panama relations.
At about 7:20 a.m. on June 8,1970, under questioning by Lieutenant Charles Smith, chief of detectives, at the
*679 Balboa police station, you admitted to Lt. Smith that you had prior knowledge of the planned escape of the three colonels for about a week, but did not report or discuss it with your superiors in the Police Division. You also admitted that the wife of Colonel Sanjur was then living in your home át 720-C Barnebey Street, Balboa.
At about 8:30 a.m. that same morning, Police Sergeant Richard Kinsey accompanied you to your residence where Mrs. Sanjur signed a political refugee form. Mrs. Sanjur told Sgt. Kinsey that she had come from Panama into the Canal Zone in the early evening hours of June 7 to begin her stay at your quarters in anticipation of the escape of her husband. You were evasive in your answers to Sergeant Kinsey concerning details of the escape plan. Mrs. Sanjur remarked that she was sorry they were unable to free Colonel Bernal, who was jailed on a different floor of the Cárcel Modelo, but she said it would have ruined the plan to try to get him out too.
Still later on the morning of June 8, you were interviewed by Captain H. C. Richards, district police commander, in the presence of Sgt. Kinsey. You were evasive and gave contradictory answers when Captain Richards questioned you to determine the extent of your involvement in the escape. For example, at one point you stated that an attache case containing the Sanjur papers had been delivered to your residence about a week earlier by Mrs. Sanjur’s nephew. Later you stated that Mrs. Sanjur had brought the case to the house. Shortly after the interview with Captain Richards, you informed Sgt. Kinsey that you had not mentioned the jailbreak plan to any of your superiors in the Police Division because it would have meant that written reports would have been forwarded, and too many outsiders would then have had knowledge of the proposed escape.
'On June 12, 1970, at about 1:00 p.m., you were again questioned by Lt. Smith concerning your knowledge of the escape of the colonels, and you admitted to him that you had known of the planned escape for “about four or five days” prior to the escape.
At the time of the events described above, in early June, 1970, as at times previous thereto, you were performing the duties of liaison agent for the office of the chief of detectives at Balboa. One of the important duties of all Canal Zone police officers is to furnish information to their superiors on matters within their knowledge that bears on law enforcement and the maintenance of peace and order in the Canal Zone. In addition, one of *680 the most important duties of a liaison agent is to acquaint himself with and report on matters concerning the Republic of Panama that are of interest to law enforcement officials in Panama and the Canal Zone. Your advance knowledge of plans for the imprisoned National Guard Colonels to break out of the Cárcel Modelo and flee into the Canal Zone was intelligence of vital interest and importance to your superiors. So, also, was your knowledge that Mrs. Sanjur had come from Panama into the Canal Zone to seek refuge, and especially since her reason was to await the imminently expected escape of her husband from custody.
Certain events after June 12,1970, hereinafter related, are relevant to procedural questions raised by plaintiff. On June 18,1970, plaintiff met with Gaddis Wall, Chief, Police Division, Canal Zone, and with Captain Richards. At the meeting, plaintiff was counseled and advised that he had been derelict in his duty by failing to advise the Canal Zone Police of the impending escape of Colonel Sanjur. The counseling was not regarded as an official disciplinary act by Chief Wall.
On June 20, 1970, plaintiff accompanied Mrs. Sanjur on the sailing to Miami. After arriving at Port Everglades on June 23, 1970, plaintiff returned by airplane to the Canal Zone on June 24,1970. Plaintiff then went on vacation with his family for a period of one week.
On August 25,1970, plaintiff was arrested by the National Guard of Panama. The charges against plaintiff were stated to be “active participation in plots aimed at overthrowing the present Government of the Republic of Panama, using to this end, his [plaintiff’s] status as a Canal Zone Policeman and his residence and telephone in Balboa.”
On August 27, 1970, Edward A. Doolan, Persomiel Director of the Canal Zone, sent plaintiff a letter informing him of a proposal to remove him from his position. On September 10,1970, Mr. Doolan sent plaintiff a letter rescinding his letter of August 27, 1970. Mr. Doolan stated his reason for taking this action: “because it does not appear that you can personally respond to the charges or appear at a hearing to present your case.” Mr. Doolan stated that published re *681 ports indicated plaintiff had been sentenced to a term of imprisonment. Mr. Doolan’s letter went on to state that plaintiff had been separated for having abandoned his employment with the Canal Zone.
On September 17,1970, Resolution Number 17 was issued condemning Oscar Taitt, Andreas Poschl H., and Alfredo Aterido Aparicio to the term of two years in jail. During the middle of October, plaintiff was transferred to the penal colony on the Island of Coiba. Plaintiff was released from the penal colony on December 14,1970.
On July 12, 1971, Mr. Doolan sent a letter to plaintiff rescinding the previous letter of September 10, 1970. Plaintiff was retroactively reinstated as a police private effective August 25,1970. He was placed in a leave-without-pay status from August 25, 1970, through December 16, 1970. Regular compensation was to be paid effective December 17,1970. On July 12,1971, Mr. Doolan sent a letter to plaintiff notifying him of a proposal to remove him from his position as a police private. The reasons for the proposed action were the five charges listed in footnote 2. In addition, Mr. Doolan notified plaintiff that he was placed in a non-duty pay status for a period not to exceed five days in order to effect plaintiff’s suspension for 30 days or less. On July 13, 1971, plaintiff was notified that effective 24 hours after receipt, he was suspended from duty without pay for 30 days during the notice period of the proposed removal. Mr. Doolan stated that the retention of plaintiff in an active duty status would be detrimental to the interests of the government. Plaintiff responded to Mr. Doolan’s letter of July 12,1971, on July 21, 1971, and denied the charges.
On August 11,1971, Daniel J. Paolucci, Acting Personnel Director, Canal Zone, sent a letter to plaintiff informing him that the charges in the letter of July 12 warranted plaintiff’s removal. The effective date of the removal was August 12, 1971.
On August 25,1971, plaintiff appealed his removal by letter to the Governor of the Canal Zone, David S. Parker.
Plaintiff was allowed to choose a hearing examiner for his appeal and did so by letter, choosing one Roger Toledano.
*682 The hearing was held on October 27,28 and 29,1971, before said hearing examiner, Roger Toledano. A complete, 285-page transcript of the proceedings before the hearing examiner, together with documentary evidence presented, constitutes a major portion of the record presented to this court in this case. The hearing examiner submitted his findings and recommendations to the Governor on January 24, 1972, and found only charge 1 supported by the evidence. All remaining four charges, he found unsubstantiated. In pertinent part in his Recommendations, this is what the hearing examiner decided:
* * * appellant did, in effect, fail to reveal information * * * as would be required * * *. I, therefore, concur with the Personnel Director’s letter of decision in respect to the 1st charge. The other charges set forth did not have enough substantial evidence to back them up. Since any one of the charges is of sufficient gravity to require removal of the appellant, I would then have to concur with the removal decision. * * *
However, the hearing examiner was partially overruled by the Canal Zone Governor and by a decision dated May 5, 1972, the said Governor, David S. Parker, found
* * * the first and fifth reasons for your discharge, or either of them, fully support your removal as promoting the efficiency of the service. * * *
In other words, the Governor agreed with the hearing examiner that charges 2, 3 and 4 were not substantiated, whereas charge 1 was substantiated. But the Governor reversed the hearing examiner on charge 5 and found that it was substantiated and supported removal. The Governor concluded that the two charges, 1 and 5, were supported and that either of them fully supported plaintiff’s removal.
Plaintiff then appealed to the Civil Service Commission on May 11,1972. On June 6,1972, the Appeals Examining Officer denied plaintiff’s request to appeal on the ground that the Commission lacked jurisdiction since plaintiff was neither employed in the competitive service nor was a preference eligible employee in the excepted service. Plaintiff appealed to the Board of Appeals and Review. The BAR affirmed the *683 decision of the Appeals Examining Office. Plaintiff does not now contest the decision of the Civil Service Commission denying jurisdiction.
Plaintiff filed suit in this court on October 2,1973.
We have examined the record established before the hearing examiner and after hearing argument of counsel, it is our opinion that the Governor properly sustained charge 1 and that the Governor also properly found that charge 1 only was sufficient to support plaintiff’s removal. We, therefore, do not find it necessary to review the Governor’s findings and conclusions with relation to charge 5, the conviction of crime charge. Most of the able argument by counsel in the briefs and by way of oral argument in this court related to the validity of plaintiff’s conviction under Eesolution 17, an alleged judgment of a Panama court. Since we have chosen to uphold plaintiff’s removal under charge 1 only, we do not find it necessary to express our views regarding the validity of Eesolution 17.
Plaintiff first complains that the Canal Zone did not comply with all procedural requirements in effecting plaintiff’s removal. His first specific ground is that the counseling session given him by Chief Wall on June 18, 1970, was “discipline.” Plaintiff then argues that his removal was for the same offense for which he received “discipline” and, therefore, his removal is invalid. Essentially, plaintiff is arguing that if an employee is disciplined for offense X, then the agency is barred from taking adverse action against the employee on the basis of offense X.
The first problem with plaintiff’s argument is that Chief Wall’s counseling of plaintiff was not a disciplinary act. Furthermore, the case cited by plaintiff does not hold, as plaintiff argues.
First, then, we must consider the problem of whether the counseling session with Chief Wall can be considered a disciplinary act. Plaintiff argues the counseling session was an admonishment or a reprimand. The record is clear that it was not a reprimand. No reprimand was given in writing to plaintiff and nothing was placed in his official personnel folder as is required by Panama Canal Personnel Manual *684 (PCPM) § 751, Subchapter 2, 2-5 (2).[3] It seems also clear that the counseling session was not an oral admonishment as defined by PCPM §751, Subchapter 2, 2-5(1).[4] In the first place, Chief Wall was not plaintiff’s “immediate supervisor.” Captain Richards, as District Police Commander in Balboa District, would have been the supervisor ordinarily required to administer such an admonishment. In the second place, Chief Wall in his testimony continually referred to the session as “counseling” and not as either a reprimand or admonishment. Finally, Governor Parker in his decision of May 5, 1972, specifically held that the counseling session was not a displinary action as defined by PCPM § 751 or 752, but was merely a counseling session. This court may, therefore, not overturn such a factual determination unless it finds the decision arbitrary, capricious, or unsupported by substantial evidence. Grover v. United States, 200 Ct. Cl. 337, 343 (1973). Consequently, we find that the June 18, 1970, meeting with plaintiff and Chief Wall was a counseling session and not an admonishment or reprimand.
We do not find anything in Jacobowitz v. United States, 191 Ct. Cl. 444, 458-459, 424 F. 2d 555, 563 (1970), which is in favor of the plaintiff:
This only leaves Charge I relative to the late cashing of taxpayers’ checks by plaintiff as stated in the two specifications of this Charge. It is our view that Charge *685 I and Charge II are so intertwined and braided together, with Charge II being the principal complaint against plaintiff, that when Charge II is held to be invalid, Charge I must suffer the same fate. As a matter of fact, counsel for the government tacitly agreed at oral argument before us that the plaintiff would not have been discharged under Charge I had it not been for Charge II. In any event, we agree with plaintiff that his discharge on Charge I after 22 years of satisfactory government service was too harsh and out of all proportion to the offense charged. We have held that a dismissal under such circumstances is an abuse of discretion, is illegal, and demands redress by this court. [Citations omitted.] This charge was minor in nature, was old, and plaintiff had already received a reprimand for it from his superior. His dismissal based on this charge was too harsh and an abuse of discretion by the agency under all of the circumstances and will not be allowed to stand.
It is clear that this court refused to uphold the removal on the basis that it was too “harsh and an abuse of discretion.” The court did not hold that a previous reprimand for an offense barred using that offense as a basis for removal. In fact, by resting its holding on the abuse of discretion, the court assumes that a previous reprimand does not bar using an offense as a charge for removal.
Plaintiff next makes the argument that the adverse action decision is barred by reason of a delay in giving plaintiff notice of the adverse action.
The controlling regulation governing the timeliness of agency action is PCPM § 751, Subchapter 2,2-2:
To be most effective, discipline shall be timely and prompt at every step in the procedure, but not so hasty as to preclude consideration of the facts or to limit such consultation or deliberation as the circumstances may warrant.
A case involving a similar regulation has previously been decided by this court. Cook v. United States, 164 Ct. Cl. 438 (1964). In Cook the plaintiff committed the crime of theft on January 18, 1961; he was charged on February 9, 1961; he pleaded guilty and was fined on February 15, 1961; the advance notice of proposed removal was issued March 27, 1961. This court in Cook stressed the reasonableness of the *686 agency’s waiting “until it was finally determined by a court that plaintiff was guilty.” Cook v. United States, supra, at 444. Following final court action, there followed:
* * * submission of a report by plaintiff’s immediate supervisor, endorsement by the department head, an interview accorded plaintiff with his immediate supervisor, an interview with the person whose property was taken by plaintiff, and a report from the leading man to the department head. This all took some time, but we cannot say that there was unreasonable delay in processing plaintiff’s removal. Accordingly, we hold that Regulation NCPI 750 2-3b was clearly complied with.
An examination of the facts in the present case also shows that here, too, there was no unreasonable delay. On August 25,1970, plaintiff simply disappeared from his job. The first reaction of the Canal Zone, admittedly an erroneous one, was to propose to remove plaintiff on August 27, 1970. The reason for this action is easy to see. Plaintiff was not only a police officer of the Canal Zone but one assigned to liaison between Panama and the Canal Zone. His involvement caused extreme embarrassment to United States-Panamanian relations. The Government of Panama in a letter dated August 28,1970, by its Minister of Foreign Relations, addressed to His Excellency Herbert Thompson, Charge d’Affaires, a.i. of the United States of America, Panama, Republic of Panama, expressed its views as follows:
It is my duty to inform Your Excellency that the National Guard has arrested Mr. Andreas POCHL [sic] HUEMER, Panamanian, 33 years of age, Canal Zone Policeman, with residence at 770 C, Balboa, Panama Canal Zone, who is accused, based on authentic evidence, of active participation in plots aimed at overthrowing the present government of the Republic of Panama, using to this end, his status as a Canal Zone Policeman and his residence and telephone in Balboa.
Policeman Andreas POSHL [sic] HUEMER received instructions from former National Guard Colonel Amado SANJUR ATENCIO, from Miami, to prepare, together with Mr. Augusto Gregorio ATENCIO, subversive plans against the Panamanian Government. Likewise, Mr. POSHL [sic] HUEMER has a duly verified record of using Panama Canal Zone territory as a *687 sanctuary for elements preparing subversive plots against the Republic of Panama.
I wish to request Your Excellency to forward the above information both to the Department of State and to the Canal Zone authorities, as the government of Panama finds it is intolerable that the part of its territory pertaining to the Canal Zone be used to promote subversive plans against the Panamanian institutions themselves.
Likewise, given the friendly relations existing between our two Governments, the freedom of action enjoyed by former Colonel Amado SANJUR ATENCIO in the United States of America to promote from there subversive acts against the Republic of Panama puzzles the Panamanian Government.
I take the opportunity to reiterate to your Excellency the assurances of my highest and most distinguished consideration.
The Canal Zone very quickly realized, however, that since plaintiff could not respond to adverse action charges, it would not be fair so to proceed. Instead, the Canal Zone separated plaintiff for abandoning his employment. The guidelines for abandonment actions are set out in FPM § 751, Subchapter 2, 2-1.[5] The agency is first required to ascertain *688 the intention of the employee as to whether he will return. Of course, in this case, the agency could not do this since plaintiff could not be contacted. The FPM next states that after a reasonable time (10 days or more), if the agency still cannot contact plaintiff, it may either process his separation as an abandonment or as an adverse action for absence without leave. The FPM notes, however, (FPM §751, Sub-chapter 2, 2-1 (b) (2) (a) ), that the adverse action proceeding is frowned upon because of the difficulty of giving notice. In fact, the Canal Zone did take the better route and treated plaintiff’s absence as an abandonment. Such a proceeding does not require the job protection procedures of FPM § 752. FPM § 751, Subchapter 2, 2-1 (b) (2) (b).
From August 25,1970, until December 16,1970, the Canal Zone could not receive any communications from plaintiff since he was in prison. On December 16, 1970, plaintiff appeared and by letter notified the Canal Zone that he wished to continue his employment. He alleged that he had been “wrongfully detained” by Panama. The question for the agency, then, was whether plaintiff was guilty. As this court in Cook stressed, it was reasonable for the agency to wait “until it was finally determined by a court that plaintiff was guilty.” Cook v. United States, supra, at 444.
In Panama a record of conviction is kept by the National Department of Investigation, referred to as the DENI. The Canal Zone could request such records and they would be furnished by the head of the DENI. In the plaintiff’s case, inquiries had been made to ascertain whether he had been convicted. Mr. Cazorla, police detective of the Canal Zone, had made inquiries to various courts to determine if plaintiff had been convicted and sentenced. The record shows that the Canal Zone police were not given full cooperation by Panama. Even the night judge who signed Eesolution 17 was hesitant to turn it over. Mr. Cazorla testified that the change in government made it different. Finally, after some months, *689 an official record was given to the Canal Zone on April 23, 1971, showing plaintiff’s alleged conviction.[6] Thus, it was only on April 23, 1971, that the agency was able to obtain the alleged conviction papers relating to plaintiff. Thus, the delay until April 23, 1971, we hold, as in Cook, to be reason *690 able under all the strange and unusual circumstances in this case.
On May 8, 1971, a few working days after the discovery of the papers showing the alleged conviction, the Canal Zone called Harry Allen, plaintiff’s attorney, to discuss a possible negotiated solution to the situation. During May and June, negotiations continued between the Canal Zone and Mr. Allen. Clearly, just as in Cook, various procedures were taken after discovery of the conviction to determine the best course of action. Plaintiff can hardly object to such procedures since his counsel participated in them.
Unfortunately, the negotiations between the parties were unsuccessful. The question then became, again, what should the agency do? The agency had already separated plaintiff for abandonment. Plaintiff had requested restoration. On the other hand, the Canal Zone had several charges for which they could proceed by way of an adverse action for plaintiff’s removal. It is stated in FPM § 751, Subchapter 2, 2-1 (b) (2) (b) that:
An employee may be separated for abandonment of position without following the job protection procedures in chapter 752. A nontemporary employee, however, who asks to be restored to duty after being separated in this way should be restored unless the agency has proof that he actually abandoned his position; otherwise, the Commission may find upon appeal that he did not abandon his position and order him to be restored. Any disciplinary action that may appear to be warranted can be taken after the employee is restored to duty.
In order to establish abandonment, there must be an intent to abandon. Grove Laboratories, Inc. v. Brewer & Co., 103 F. 2d 175, 185 (1st Cir. 1989). Given the fact that plaintiff’s absence was caused by his arrest and physical confinement, the Canal Zone justifiably doubted their ability to prove intent to abandon. Instead, following the recommended FPM procedure, the Canal Zone restored plaintiff to duty. In addition, the Canal Zone gave plaintiff full pay for the period December 16, 1970, to July 12, 1971. Thereafter, following FPM recommended procedures, the Canal Zone instituted adverse action procedures against plaintiff.
*691 In summary, there has been no unreasonable delay in this case. Defendant has shown that during the period August 25, 1970, to December 16, 1970, the plaintiff was unavailable to the Canal Zone. After plaintiff’s release, the Canal Zone sought information concerning plaintiff’s alleged conviction; the documents of the alleged conviction were found on April 23, 1971. Needless to say, such a long delay may seem improbable under our court systems where conviction records are easily obtained from court records. The situation related in footnote 6 by plaintiff’s own attorney showed the complexity of the situation. It appears that there were reasons to withhold the Resolution by those who issued it. We need not go into the merits of the judgment but it was obtained under questionable and unusual circumstances, and there was reason to delay its public exposure. During May and June, 1971, negotiations were conducted with plaintiff’s attorney, seeking some sort of solution. Finally, negotiations having broken down, plaintiff was restored to duty on July 12,1971, and adverse action taken on July 13, 1971. As was said in Cook by this court: “This all took some time, but we cannot say that there was unreasonable delay in processing plaintiff’s removal.” Cook v. United States, supra, at 444.
Plaintiff alleges that there was an error in procedure regarding “30-day suspension without pay on charges, without right to reply.” It was raised for the first time before this court. Neither the hearing examiner nor the Governor were given notice of such errors. We decline to review such alleged error. Grover v. United States, supra, at 345.
We, therefore, hold that with relation to charge 1 there were no procedural errors.
Since there were no procedural errors, we are in a situation well stated in Morelli v. United States, 177 Ct. Cl. 848, 858 (1966):
* * * Where an administrative agency has complied with the prescribed procedural requirements, the Court of Claims can only review the action to determine whether the officials who effected the dismissal acted arbitrarily, capriciously or were so grossly erroneous as to be in bad faith, as for instance where they may *692 have acted without substantial evidence to support their decision or where they exceeded their authority. *t* *
Many other decisions of this court have also used the standard of review enunciated in Morelli. Grover v. United States, supra, at 343; Holman v. United States, 181 Ct. Cl. 1, 8, 383 F. 2d 411, 415 (1967); Love v. United States, 119 Ct. Cl. 486, 493-494, 98 F. Supp. 770, 774, cert. denied, 342 U.S. 866 (1951).
The presumption in this court’s review of all civilian pay cases is that the Government officials have acted in good faith. Travis v. United States, 199 Ct. Cl. 67 (1972); Holman v. United States, supra; Morelli v. United States, supra; Greenway v. United States, 175 Ct. Cl. 350, 362, cert. denied, 385 U.S. 881 (1966). This court has clearly stated the burden plaintiff bears in order to counter such a presumption in Tramis v. United States, supra, at page 70:
There is a strong presumption that public officials act in good faith and the court will only look behind an administrative determination such as the one herein involved if the plaintiff meets the difficult burden of showing that the decision was so lacking in rational support as to be characterized as arbitrary or capricious. Horne v. United States, 190 Ct. Cl. 145, 150, 419 F. 2d 416 (1969). * * *
The quality of proof necessary for plaintiff to overcome the presumption that an official acted in good faith is high. In Knotts v. United States, 128 Ct. Cl. 489, 492, 121 F. Supp. 630, 631 (1954), this court said that * * we start out with the presumption that the official acted in good faith. We are always loath to find to the contrary, and it takes, and should take, well-nigh irrefragable proof to induce us to do so.” Accord, Grover v. United States, supra, at 344.
We agree with defendant that plaintiff has plainly failed to make any showing that the decision by the Governor of the Canal Zone sustaining plaintiff’s removal under charge 1 is either arbitrary or capricious or unsupported by substantial evidence. During the period in June shortly before the jailbreak of the colonels, plaintiff was serving as a liaison agent. Plaintiff had served in this capacity previously for varying periods of time. The duties of a liaison agent included inves *693 tigation of crime and gathering of information. One of the most important duties of a liaison agent was to maintain close liaison with the Panamanian National Guard and the DENI in order to keep abreast of events in Panama, particularly political events which could backfire into the Canal Zone.
The escape of the colonels from the Cárcel Modelo was an event of far-reaching concern for Panama, the Canal Zone, and the United States Government. The escape of the colonels was widely reported in the press. Immediately following the escape, a lengthy and increasingly explosive correspondence occurred between Panama and the Government of the United States. Plaintiff’s foreknowledge of the escape of the colonels was exactly the sort of politically sensitive information which plaintiff was required to report to his superiors.
Captain Charles Smith, the District Commander in Cristo-bal, testified that on June 8, 1910, plaintiff told him that plaintiff had foreknowledge of the colonels’ escape and had this knowledge for about a week. Captain Smith further testified that plaintiff’s reason for not informing his superiors of the planned escape was that he feared for the safety of Colonel Sanjur.
Sergeant Richard H. Kinsey, assigned to the Balboa District, testified that on June 8, 1970, plaintiff told him that plaintiff had foreknowledge of the escape but did not want to mention it to anyone because of fear that a leak to anyone would ruin the whole escape plan. Sergeant Kinsey testified further that at a subsequent meeting with plaintiff, Sergeant Kinsey, and Captain Richards, the plaintiff again stated that he had foreknowledge of the escape but did not want to mention it to too many people because of the hazard of the escape plan being aborted. Captain Richards stated: “Do you mean you didn’t feel it safe even to tell your superior officers?” Plaintiff’s reply was that he had not wanted to discuss the escape plan with anyone. Still later in the day, Sergeant Kinsey stated to plaintiff that plaintiff should have realized how wrong he was for not informing superiors of the escape. Plaintiff responded, “Well, you know how it is, Sergeant, if you tell something like this, right away they *694 want memorandum [sic] and a memorandum can get out of hand. A lot of people get to read it.”
Sergeant Andrew M. Wright, Jr., Detective, testified that on June 9, 1970, he was requested to monitor an interview between Captain Smith and plaintiff. Plaintiff told Captain Smith that he had knowledge of the escape plan four or five days before it was executed and that he really wanted to tell Captain Smith but was afraid of a security leak.
In response to this overwhelming testimony, plaintiff himself testified that he had heard rumors concerning the colonels but had dismissed them as gossip. Clearly, plaintiff admitted knowledge to his superior officers and his self-serving characterization of such knowledge as “gossip” does not minimize the admission to his superiors.
In addition to the direct testimony, much circumstantial evidence indicates plaintiff knew of the escape plans. To begin with, plaintiff himself admitted that he had known, and was close to, both Colonel Sanjur and his wife for a number of years.
Next, Captain Smith testified that plaintiff told him a brief case was delivered to plaintiff’s home four or five days prior to the escape and that plaintiff told him that the brief case was one of the reasons he knew about the escape. Sergeant Kinsey testified that plaintiff told Captain Richards that the brief case was delivered by Colonel Sanjur’s nephew about a week before the escape. Sergeant Kinsey testified that plaintiff had made a conflicting statement that Mrs. Sanjur had brought the brief case with her. Captain Richards remarked, “Doesn’t it seem odd that we’ve got two conflicting statements here so close together.” Sergeant Wright testified that at the June 9 meeting, plaintiff had stated that the brief case was brought to his home four or five days before the escape. The brief case contained the passports, visas, and personal papers of Colonel Sanjur and his wife. Mrs. Sanjur swore that the brief case was delivered prior to June 8.
Plaintiff admitted that the brief case was delivered to his home some days before the escape on June 8.
Finally, Captain Smith testified that plaintiff told him Mrs. Sanjur had arrived at his home on June 7. Plaintiff first notified Captain Smith that Mrs. Sanjur had taken *695 refuge on June 8. Sergeant Kinsey testified that plaintiff stated Mrs. Sanjur had been at his house all night the night of June 7.
There is some conflicting testimony by Mrs. Sanjur, plaintiff and Mrs. Arango that Mrs. Sanjur did not arrive until around 6:00 or 7:00 a.m. at plaintiff’s house. Nevertheless, even if plaintiff presented evidence to the agency which contradicted evidence presented by the agency, that situation would not render the agency’s evidence unsubstantial. “Exaggeration, inherent improbability, self-contradiction, omissions in a purportedly complete account, imprecision and errors may all breed disbelief and therefore the disregard of even uncontradicted nonopinion testimony.” Sternberger v. United States, 185 Ct. Cl. 528, 536, 401 F. 2d 1012, 1016 (1968).
In summary, then, we find that Governor Parker had substantial evidence to support plaintiff’s removal under charge 1 and the Governor’s decision was neither arbitrary nor capricious. See Grover v. United States, supra, and Holman v. United States, supra.
CONCLUSION
We, therefore, conclude and adjudge that plaintiff’s petition be and is hereby dismissed. For the reasons above stated, we deny plaintiff’s motion for summary judgment and allow defendant’s cross motion for summary judgment.

 “AUTHORITY: The provisions of this Part 255 Issued under E.O. 11222 of May 8, 1965, 80 F.R. 6469, 3 CFR 1965 Supp.; 5 CFR 735.104.
“Subpart A — General Provisions
“$ 255.735-1 Purpose.
• • * * •
“(b) The nature of the Canal enterprise, Its geographical location, and the political status of the United States In the Canal Zone make it necessary to Impose certain restrictions on personal conduct both on and off the job that are not ordinarily applicable to Federal employees. In particular, the officially declared Interest and policy of the Government of the United States In strengthening the bonds of friendship with the Government and people of Panama, place a direct responsibility on each employee, for himself and his dependents, to refrain from any action or conduct that might In any manner obstruct accomplishment of this end or of any other declared national-policy objective of the United States concerning relations between the United States and Panama.
• • * * *
“Subpart B — Ethical and Other Conduct and Responsibilities of Employees
“5 255.735-30 Proscribed actions.
“An employee shall avoid any action, whether or not specifically prohibited by the regulations In this part, which might result In, or create the appearance of:
• • • • •
“(f) Affecting adversely the confidence of the public In the Integrity of the Government.
» * • * *
“5 255.735-38 General conduct prejudicial to the Government.
“An employee shall not engage In criminal, infamous, dishonest, Immoral, or notoriously disgraceful conduct, or other conduct prejudicial to the Government. For employees on the Isthmus, relations between the United States and Panama wlU be considered in determining whether conduct Is prejudicial to the Government.
*****
“5 255.735 — 41 Participation in Panamanian political activities.
“In view of the geographical and other relationships between the Republic of Panama and the Canal Zone, the following policies are prescribed concerning participation by employees In Panamanian political activities:
“(a) Employees residing In the Canal Zone who are not Panamanian citizens shaU not engage In any form of Panamanian political activity.
“(b) Employees who are Panamanian citizens may exercise political rights guaranteed to them by Panamanla law. They may affiliate themselves with *677 the political party of their choice. They may attend political meetings and be free to vote in all elections without jeopardizing their position with the Panama Canal agencies. However, no employee shall:
“(1) Engage in Panamanian political activity in or from within the Canal Zone;
“(2) Engage in Panamanian political activity during duty hours; or “(3) Use his job or position with the Panama Canal agencies in the advancement of Panamanian political activity.
“(c) Any employee who may be appointed or elected to political office in the Republic of Panama shall be required to terminate his employment with the Panama Canal agencies.”

 “This is to notify you that it is proposed to remove you from your position as police private in the Police Division of the Canal Zone Government not earlier than 31 calendar days after the date you receive this letter. The reasons for this proposed action against you are as follows:
“1. Failure to reveal information to your superiors that you hnew (or, in view of your position as a Canal Zone police private acting as a liaison agent, you should have hnown) you were obligated to disclose to them.
“2. Engaging in prohibited Panamanian political activities.
“3. Conduct prejudicial to the Government.
“4. Acts that could reasonably be expected to affect adversely the confidence of the public in the Integrity of the Government.
“5. Conviction of a crime.
“Any one of the foregoing reasons is considered sufficient grounds for your removal. My proposed action, therefore, is not based upon an accumulation of two or more of those reasons.”

 “§ 751 SUBCHAPTER 2 — Disciplinary Practices
* * * • •
“2-5 Effecting the Action.
* » * • •
“(2) Written reprimand. Supervisors shall have the authority to Issue written reprimands to their subordinate employees. The employee shall be given an opportunity to explain his conduct, at least informally, before the decision is made to issue the letter of reprimand. The letter shall state in detail the reasons for its issuance, and it shall inform the employee of his right to appeal under the agency’s grievance procedure within fifteen (15) calendar days after the reprimand is received by him. A copy of the reprimand shall be placed in the employee’s official personnel folder.’’

 “(1) Oral admonishment. The most informal means by which an employee's attention is called to deficiencies in his conduct or work performance is that of oral admonishment. This action shall ordinarily be taken by tha immediate supervisor. No record of such admonishment shall be placed in the employee’s official personnel folder, but should be kept in the unit’s files. Oral admonishments are not applicable under agency grievances or adverse action procedures. When necessary and appropriate to describe a pattern of conduct or performance, reference to past incidents for which an employee has been orally admonished may be included in specifications of proposed disciplinary action or performance rating warnings.”

 “§751 SUBCHAPTER 2—Specific Disciplinary Situations

“2-1 Absence Without Leave.

*****
“b. Prolonged absence a/nd failure to return from leave or furlough. (1) When an employee falls to report for duty, or to return from leave or furlough, and falls to Inform his agency what he Intends to do, the agency should attempt to determine his intentions. If he replies that he has quit, the separation should he processed as a resignation. If he requests additional time, consideration should be given to a grant of leave. When an employee absents himself without approved leave but indicates his intent to return to duty, the agency may Institute separation or other appropriate disciplinary action.
“(2) When, after a reasonable time (10 calendar days or more), the agency has been unable to ascertain the employee’s intention concerning his return to duty, it has the option of processing his separation as an abandonment of position or as an adverse action for absence without leave.
“(a) If the agency attempts to process the separation as an adverse action, it is sometimes faced with the problem of serving notice on the employee, and there is also the possibility that the employee may return to duty before the separation action is consummated.
“(b) An employee may be separated for abandonment of position without following the job protection procedures in chapter 752. A nontemporary employee, however, who aslcs to be restored to duty after being separated in this way should be restored unless the agency has proof that he actually abandoned his position; otherwise, the Commission may find upon appeal that he did not abandon his position and order him to be restored. Any dis *688 ciplinary action that may appear to be warranted can be taken after the employee is restored to duty.
“(3) Separations for absence without leave are processed in the same manner as other adverse actions. Separations for abandonment of position are processed as Separation — 'Abandoned Position, in the manner prescribed in chapter 715. * * »”

 Plaintiff was represented before the hearing examiner by attorney Harry H. Allen, Jr. In his opening statement before the examiner, he stated as follows concerning the confused state of affairs in Panama regarding the alleged conviction records of plaintiff, Tr. at 4—5:
“* * * Mr. Poschl, responding to a request of an old-time friend to come over and have a drink or come over and see him — the old-time friend being the man in charge of the Cárcel Modelo and a member of the National Guard— he went over to see him, which is not out of the ordinary for him. He was arrested and put incommunicado in the Cárcel Modelo. That was on August 25, I believe. Two days later, the National Guard published and released to the local papers a story that he had been convicted of subversive activities against the actual government of Panama, to use their words, and had been given two years in Coiba. Remember that date is August . . . (checking his files) the date is August 28, 1970. The Government now charges here that he was convicted on September 22, almost a month later. And they have produced, and we have the documents here, and I have no doubt that they were put before the Hearing Examiner today, papers from DENI which is the Investigation Department of the Panama Government showing that he was convicted on September 22. But, on the other hand, we have been furnished what purports to be a judgment of the Night Court in Panama showing that the man was convicted on September 17, a difference of five days. We will also show, I believe, thru expert witnesses, that the Night Court in Panama was without jurisdiction in this type of a matter. And we will show also that Mr. Poschl was at no time tried or faced his accusers in the Night Court or in any court, and that he was not tried, he was not found guilty. And all of these papers that are before you today, showing this conviction, are as phony as a three-dollar bill. He was never before the court and he was, in fact, in his cell and late one evening he was told to go down, taken down to an office downstairs where Beleño who is the Night Court Judge, said, “Sign the papers. I have orders. This is it. You sign them, and that’s it." He signed; he had been endorsed by office some time there. Shortly after this he was taken up to Coiba under a sentence of two years at the prison island. To go further than this, all of a sudden . . . and to show how phony this operation was, how unreal and how illegal, and how much it was against even the Panama law, when a man is convicted in the courts of Panama and sentenced to serve a time in jail, this conviction is reported to a Department of Correction under the Department of the Minister of Government and Justice. It is that department that determines where the man will serve the sentence; not like in the Canal Zone — we only have one penitentiary with regard to Panamanians and the Panamanians are sent there as a matter of course and as a matter of law. But the Department of Correction in Panama can determine whether a man should serve the sentence in the common jail, in Capira, in Bejuco, Chame, or any place that they want. This record is not in that office and never was there and is not there today.
“We will show also by documents that months after his so-called conviction in Panama the office of DENI, the proper office who keeps track of all records of convictions of people found guilty of crimes, stated that there had been no conviction of Mr. Poschl and that his record was completely clean and there was nothing against him. And we have two of these, all of which have been furnished to the Government, and we have that before them.”